576 A.2d 834

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
WALTER JOHNSON, DEFENDANT–APPELLANT.

Argued November 27, 1989—Decided July 19, 1990.

266

*Jane E. Haburay* and *Daniel V. Gautieri,* Asst. Deputy Public Defenders, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney).

*Robert E. Bonpietro,* Deputy Attorney General, argued the cause for respondent (*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

STEIN, J.

Defendant was tried and convicted of two counts of knowing and purposeful murder, *N.J.S.A.* 2C:11–3a(1) and (2); robbery in the first degree, *N.J.S.A.* 2C:15–1; theft of property, *N.J.S.A.* 2C:20–3; two counts of possession of a dangerous weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4a; and unlawful possession of a weapon, *N.J.S.A.* 2C:39–5b. After a separate sentencing proceeding on the murder charges, *N.J.S.A.* 2C:11–3c(1), defendant was sentenced to death for one of the murders, to a life sentence with thirty years of parole ineligibility for the second murder, plus consecutive sentences totaling thirty-five years with seventeen-and-one-half years of parole ineligibility on the remaining counts.

The State concedes that the death sentence in this case cannot be sustained because the trial court erroneously instructed the jury in the penalty phase that it must find mitigat-

ing factors unanimously. *See State v. Bey (Bey* II), 112 *N.J.*
123, 156–61, 548 *A.*2d 887 (1988). We also reverse defendant's
convictions on federal-constitutional and state-law grounds that
are unrelated to the capital-punishment act (*L.*1982, *c.* 111) (the
Act) or to the case law construing the Act. *See, e.g., State v.
Ramseur*, 106 *N.J.* 123, 524 *A.*2d 188 (1987); *State v. Biegen-
wald*, 106 *N.J.* 13, 524 *A.*2d 130 (1987). We hold that the trial
court committed reversible error admitting defendant's confes-
sion into evidence because the detectives who interrogated him
did not scrupulously honor defendant's right to remain silent.
*See Michigan v. Mosley*, 423 *U.S.* 96, 96 *S.Ct.* 321, 46 *L.Ed.*2d
313 (1975). Notwithstanding substantial independent evidence
of defendant's guilt, we are unable to conclude that that error
was harmless. Because the confession as well as other illegal-
ly-coerced statements had a clear capacity to affect the outcome
of the trial, we reverse the murder convictions as well as the
convictions on the robbery, theft, and weapons charges and
remand the matter for retrial.

## I.

On April 30, 1984, Susan Sayer of Pitman received a call from
the secretary of the Sewell School. Alice Sharp, a teacher at
the school and Mrs. Sayer's neighbor, had not reported for
work. The secretary had called the Sharp house, but no one
had answered. She asked Mrs. Sayer to check on Mrs. Sharp.

Mrs. Sayer went next door to the Sharps' home. She found
the Sharps' cellar and back doors unlocked. When no one
answered her calls, she entered the house. Beyond the dining
room, in the center hall, she found the bodies of Bruce and
Alice Sharp.

Police Officer Bates and Captain McHenry of the Pitman
Police Department responded to Mrs. Sayer's telephone call.
They ascertained that the Sharps were dead, noted a broken
vase and a fireplace poker lying near the bodies, discovered no

signs of forced entry, and found that the upstairs bedroom had been ransacked. They informed the prosecutor's office.

Later that day, the police interviewed Tom Herrara, who told them that on the previous day, he had cut the grass at the Sloans' house across the street from the Sharps'. Part of his job was to dump the Sloans' grass clippings into the Sharps' compost heap. He told investigators that while wheeling his cart full of clippings up the Sharps' driveway, he had encountered a man. They exchanged no words. After first running to some bushes, the man retrieved a dirty gray bicycle with an orange sticker on it and rode away. According to Herrara, the man had big eyes and long "scraggily" hair and wore boots.

On May 1st, Paul Godman, an officer in the Pitman Police Department, received a call from his nephew, Carmen Cattafi. Cattafi had read about the murders in the newspaper, and told his uncle that he knew something about them but was afraid to get involved. Godman set up a meeting between Cattafi and detectives from the Pitman Police Department and the Gloucester County Prosecutor's Office.

According to Cattafi, he, defendant, and another acquaintance, Gerald Smith, had spent a couple of hours on the day of the murders drinking wine at Smith's house in Glassboro. At approximately 1:00 p.m., defendant borrowed Cattafi's gray bicycle, saying that he had to get some things that he had "stashed."

Perhaps two hours later, Smith and Cattafi encountered defendant on the streets of Glassboro. Smith and Cattafi were driving in Smith's car to Smith's girlfriend's house. Defendant was riding the bicycle back towards Smith's house. Cattafi noticed that defendant was splattered with blood. Smith stopped the car and Cattafi talked with defendant, who suggested that they go to Camden. Among these friends, "going to Camden" was a euphemism for buying drugs.

The threesome headed back to Smith's house, where defendant washed some of the blood from his face and arms with a

garden hose. He disjointedly explained that he had killed one or more people. Cattafi, skeptical of defendant's assertions, thought it equally likely that defendant himself had been the victim of a beating, and that the blood was his own. After "ditching" the bicycle and washing up, defendant, along with Smith and Cattafi, drove to Camden to buy heroin.

During the car ride, defendant told his friends more about the murders. He explained in some detail how he had shot a man and bludgeoned the man's wife to death. Cattafi remained skeptical because he believed defendant to be an untruthful person. Defendant then showed Cattafi some jewelry and cash that he had obtained during the crime. Both the jewelry and the cash were stained with blood.

When they reached Camden, defendant bought heroin for himself and for his friends, and they injected themselves with the heroin. Thereafter, they stopped at Pennsauken Mart, where defendant bought a pair of jeans to replace the bloody ones that he was wearing. He threw the bloody pants out the car window.

Armed with Cattafi's statement, the police prepared to arrest defendant. An attempt to locate defendant in the Camden area, where he had been known to purchase drugs, proved fruitless. In the late evening of May 1, 1984, however, the police located defendant at his parents' home in Glassboro. The police surrounded the house. Defendant's brother, a member of the Pitman police force, went into the house and brought defendant out. At 1:47 a.m. on May 2nd, the police arrested defendant, frisked him, and put him into a waiting police car. Detective Wechter read defendant his *Miranda* rights, then drove him to the Pitman police station.

At the station police officers escorted defendant to an interview room. Detective Reeves arrived to conduct the interview. Detective Wechter readvised defendant of his rights. Defendant signed a form acknowledging that he understood his rights and also signed a waiver at the bottom of the form.

Detectives Wechter and Reeves witnessed the signatures. Detective Wechter then left the room and another detective, Donovan, arrived. During the ensuing interview, which commenced at about 2:00 a.m., Lieutenant Reeves asked most of the questions and Detective Donovan took notes.

According to the detectives' pretrial testimony, in the early stages of the interrogation defendant displayed an easygoing confidence. When asked about his activities on the day of the murders, defendant replied that he had spent the day at a local tavern, drinking beer with friends. When Reeves asked for the names of those friends, however, defendant refused, saying he did not want to involve them in the investigation. Reeves assured defendant of the importance of supplying the names, implying that a credible explanation of his whereabouts would allay suspicion of defendant's involvement in the murders. Reeves suggested that defendant supply the name of the bartender who had served them at the local tavern, but defendant refused. The investigators found his story unsatisfactory. Defendant offered an alternative alibi. He suggested that he had spent the better part of the day driving around with friends. Pressed for details, defendant proved equally reluctant to supply the names of his friends or their itinerary. At the end of approximately forty minutes of questioning, the detectives continued to believe that they had not received an adequate or truthful explanation of defendant's activities on the day of the murders. Defendant maintained his confident, easygoing demeanor.

Several things occurred at about 2:40 a.m. that changed the tenor of the interrogation, although the record does not make clear the order of their occurrence. The detectives asked defendant if he would consent to give exemplars of his hair, blood, and saliva. He consented. They also asked if he would consent to a search of his parents' home. Defendant declined, saying that he had no authority to consent to the search. Reeves persisted, explaining that they wanted defendant's permission to search only those portions of the house under

defendant's control, especially his room. Still, defendant refused to give his permission.

During the same period, defendant asked the detectives why his friend Gerald Smith's car was in the police department parking lot. Reeves explained that Smith had given the police information about the crime. Reeves showed defendant the complaint naming him as a suspect in the murders, and told him that the police would not have been able to obtain the signed complaint if they had not had enough evidence to prove the case. At that point, defendant's demeanor changed. Whereas he had previously appeared almost jaunty—arms folded behind his head, leaning back in his chair—he now bowed his head and would not look directly at the detectives.

Over the next hour and one-half, Detective Reeves persistently pressed defendant for a confession. He asked whether defendant felt remorse and whether defendant understood what other people would think of him for having committed the murders. Because no accurate record of the interrogation is available, it is impossible to determine exactly what was said during the period between approximately 2:40 a.m. and 4:00 a.m. Both detectives testified, however, that defendant had repeatedly answered Reeves's questions with prolonged silences and by saying either *that he could not talk about the murders or that he did not want to talk about them.* Breaks were taken several times during that period, and the authorities provided defendant with beverages and cigarettes. After each break, the questioning resumed. Finally, at approximatley 4:00 a.m., in response to Detective Reeves's inquiry whether Mrs. Sharp was still alive when he fled the scene of the crime, defendant responded affirmatively. Next, Detective Reeves asked if defendant had talked to the Sharps before the crime and defendant responded that he had. Detective Reeves then asked defendant to tell them in his own words what had happened, and defendant began to confess, narrating the events of the murder, filling in details when they were requested by

the detectives. At trial Detective Donovan recounted the substance of defendant's oral confession:

[H]e approached the house and saw the Sharps working in the front yard. He identified himself and asked if they remembered him working on the house before. Mr. Sharp said he did remember him.

They had a brief discussion whether they liked the job done at the house. The Sharps said they did. At that time Mr. Johnson told Mr. Sharp his car had broken down. He wanted to use a telephone to call for a tow truck. He was allowed to go in the house, [and] use the phone.

Mr. Sharp and Mr. Johnson had a conversation about tools. At one point they went down into the basement of the house, where Mr. Sharp showed Mr. Johnson an antique saw he had in the basement.

Mr. Sharp then went back outside and Mr. Johnson then went to the upstairs bedroom and stole some jewelry from the bedroom. Mrs. Sharp caught him as he was going down the stairs and started to holler for her husband for help.

At that point Mr. Johnson picked up a vase, a ceramic vase from the foyer area and struck her a few times with it.

At that point Mr. Sharp came in, asked Mr. Johnson what he was doing, at which point he pulled out a handgun and told Mr. Sharp to lay on the floor.

He then pulled the trigger on the gun. The gun misfired. He then pulled the slide back, chambered another round and fired into Mr. Sharp's head.

Then he tried to shoot Mrs. Sharp. The gun would not operate. He was also out of bullets, so then Mrs. Sharp was trying to get to the front door, so he grabbed a fireplace poker and struck her several times with the fireplace poker.

He then left the scene on a bicycle and went to the back yard and got a bicycle and left the scene on the bicycle.

He then told us that he went to a friend of his house, who drove him to Pennsauken where he got rid of his clothes. They went to Camden and bought three bags of dope, shot up and went back to Glassboro.

One of the detectives asked what defendant had done with the gun. Defendant revealed that he had hidden it under his mattress. The detectives renewed their request for permission to search his room, and this time defendant signed a consent form. Thereafter, defendant repeated his confession into a tape recorder. When he had finished, he signed the cassette tape, and the interrogation ended.

Pursuant to the consent he had signed, police searched defendant's room. They found a gun under his mattress and jewelry in a dresser drawer.

After a trial, at which defendant's confession figured prominently, a jury found him guilty of two counts of knowing and

purposeful murder, as well as robbery, theft, and weapons charges.

In the penalty phase of the trial, the jury found three aggravating factors: (1) the offense was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, *N.J.S.A.* 2C:11–3c(4)(g); (2) the murder was committed for the purpose of escaping detection, apprehension, trial, punishment, or confinement for another offense committed by the defendant or another, *N.J.S.A.* 2C:11–3c(4)(f); and (3) the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim, *N.J.S.A.* 2C:11–3c(4)(c). The jury also considered but did not find as a fourth aggravating factor that in the commission of the murder, the defendant purposely or knowingly created a grave risk of death to another person in addition to the victim, *N.J.S.A.* 2C:11–3c(4)(b).

Although the jury found the same aggravating factors in both murders, the result of its deliberations concerning mitigating factors for each murder differed. With respect to the murder of Bruce Sharp, the jury found only that there were "relevant factors" in mitigation. *N.J.S.A.* 2C:11–3c(5)(h). Regarding the murder of Alice Sharp, however, the jury found one additional mitigating factor—the influence of extreme emotional disturbance insufficient to constitute a defense to prosecution. *N.J.S.A.* 2C:11–3c(5)(a). The jury also weighed the aggravating and mitigating factors differently in each case. In the murder of Bruce Sharp, the jury unanimously found that the aggravating factors did not outweigh the mitigating factors beyond a reasonable doubt. In the murder of Alice Sharp, however, the jury unanimously found that the aggravating factors did outweigh the mitigating factors beyond a reasonable doubt. Accordingly, defendant was sentenced to death for the murder of Alice Sharp, and to a term of life imprisonment with thirty years of parole ineligibility for the murder of Bruce

Sharp. He appeals his convictions on all charges to this Court as of right. *R.* 2:2–1(a)(3).

## II.

### A.

At a pretrial hearing, defendant challenged the admissibility of his oral and taped confessions, contending that they had been obtained in violation of his right to remain silent and that his waiver of that right had been involuntary. The trial court ruled defendant's confession admissible. Defendant renews his arguments on appeal. We find that defendant's right to remain silent was not "scrupulously honored," as required by *Michigan v. Mosley, supra,* 423 *U.S.* at 103, 96 *S.Ct.* at 326, 46 *L.Ed.*2d at 321. Accordingly, the resultant confession was inadmissible.

After his arrest at 1:47 a.m., defendant was taken to the Pitman police station. Detectives Reeves and Donovan began interrogating defendant at approximately 2:00 a.m. At the *Miranda* hearing, both detectives testified that the crucial period in the interrogation was between 2:40 a.m. and 4:00 a.m. At 2:40 a.m., defendant learned of the charges against him, lost his easygoing confidence, and took on a sullen demeanor. At about 4:00 a.m., he began to confess.

Detective Donovan testified that the crucial one-hour-and-twenty-minute segment of the interrogation had not been tape-recorded. The only record of that time period was Donovan's subsequent report, prepared from interview notes that were not retained. Donovan's testimony revealed the following:

Q. Tell us as best you can what took place, how the conversation was going between you, what you were doing, what the defendant was doing.

A. Basically, Detective Reeves was stating some facts about the case to Mr. Johnson, at which time he became quiet saying *he couldn't talk about—kept saying I can't talk about it right now.*

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. Did you have any instances with him on that night where his responses were, in fact, not responsive to the question or the area of questioning?

A. Just when he *said he couldn't talk about it. He would hang his head and say he couldn't talk about it when Detective Reeves would ask him specific questions about the murders.*

Q. Now, as the time you're with him progressed, did Walter Johnson's behavior change in any way?

A. He became quieter, started hanging his head, just saying—*repeating over and over he couldn't talk about it. I just can't talk about it.*

Q. Did he explain anything about that any more than those words, "I can't talk about it."

A. No, he didn't.

\* \* \* \* \* \* \* \*

Q. Between when the documents to search for personal exemplars was filled out [2:40] and 4:00 o'clock when Mr. Johnson allegedly made a statement to you, what took place between the three of you?

A. Just additional questions by myself, Detective Reeves about the murders.

Q. How was Walter Johnson responding to that questioning?

A. *He just kept saying, I can't talk about it, can't talk about it.*

Q. How was he behaving during that time period, if you could characterize?

A. Became very quiet, had his elbows on his legs and his head was staring at the floor for most of the time.

Q. Were any particular statements made by yourself and Detective Reeves to try to get Mr. Johnson to speak during that particular time period?

A. *Just asking him questions, yes.*

Q. What question, if any, if you know, was it that finally received a response from Walter Johnson?

A. I believe Detective Reeves asked him if Mrs. Sharp was still alive when he left. He shook his head yes.

And I think the second question that he raised his head up and actually answered yes was he asked if he had talked to them outside in the yard.

Q. He answered yes to that?

A. He answered yes. Then he started telling us what had happened. (Emphasis added.)

Donovan maintained that defendant had not requested the assistance of an attorney or that the interview cease. Nevertheless, his testimony reveals that defendant had continually refused to answer questions about the murders for almost an hour and a half:

Q. Now, directing your attention to the time period from 2:40 to 4:00 o'clock in the morning, after he had refused the second time to sign the permission to search his room, you go on to state [in the written report] at about the fifth full paragraph down,

"We then started questioning him in reference to the murders, at which time he started staring at the floor and became very quiet."

That's a correct recitation of that sentence?

A. Yes, it is.

Q. So you're asking him about—you were asking him about these homicides?

A. That's correct.

Q. *He didn't answer any of your questions?*

A. *No, he did not.*

Q. *You kept asking him* about the questions or about the homicide?

A. *That's correct.*

Q. And you asked him about the homicides between 2:40 and 4:00 o'clock in the morning?

A. That's correct.

Q. And between 2:40 and 4:00 o'clock in the morning, he gave you no response that satisfied yourself or Detective Reeves?

A. That's correct.

Q. *And although he didn't say, according to your report, that he wanted to stop the interview, he never answered your questions?*

A. *That's correct.* (Emphasis added.)

Detective Reeves, who had conducted most of the interrogation, echoed Donovan's testimony concerning defendant's reluctance to talk about the murders during the period between 2:40 a.m. and 4:00 a.m. On direct examination, Reeves described the time period as one filled with occasional discussion interspersed with periods of "contemplation and silence" by both defendant and the investigators. He testified that he had frequently lost eye contact with defendant, who had often looked down and only nodded in response to questions. He told how defendant had failed to respond to questions and how, finally, as recounted above, defendant had begun to confess after having been asked if Mrs. Sharp was still alive when he had left the scene of the crime.

On cross-examination, defense counsel sought to develop the scant details of the interrogation process. Reeves defended his decision not to use the tape recorder until defendant was ready to confess, and stated that taking notes of defendant's exact words would have hampered the investigation. Defense coun-

sel stressed the lack of documentation of the timing and circumstances of any breaks during the interrogation.

Defense counsel also sought to establish the likelihood that defendant had been seeking, throughout the interrogation, but especially between 2:40 a.m. and 4:00 a.m., to invoke his right to remain silent. He questioned Reeves about the various ways in which defendant had indicated his refusal to answer questions:

Q. Correct me if I'm wrong, I think you indicated on direct examination that you don't recall how Mr. Johnson would have indicated to you during that time period if he wasn't—if he didn't care to answer your questions?

A. I don't recall the terminology specifically.

Q. You don't recall the terminology?

A. No.

Q. So, it's possible he could have just shook his head?

A. (Witness nods in the affirmative.)

Q. And it's possible he could have said, "I don't know?"

A. Yes, sir.

Q. *And it's possible that he could have said, "I don't want to say?"*

A. *Yes, sir.*

Q. And it's also possible that he just could have remained silent?

A. Yes.

Defense counsel emphasized the extent to which defendant had simply remained silent after questioning:

Q. And a number of times after he signed this card, indicating that he understood his rights, he remained silent after your questions?

A. He didn't respond to my questions.

Q. He remained silent?

A. That's correct.

Q. That was his right, wasn't it?

A. That certainly was.

Q. And, yet, the questioning continued?

A. That's correct.

Q. How many times did he remain silent after signing and understanding his rights?

A. I have no idea.

Q. You didn't take notes as to that?

A. No, sir.

Q. And the questioning, at least as to the confession, continued from 2:00 a.m. until 4:00 a.m.?

A. Not uninterrupted but there was a discussion in regards to the investigation with Mr. Johnson up until 4:00 a.m.

Q. Could he have remained silent a dozen times?

A. Sure.

Q. Could he have said I don't know a dozen times?

A. Yes.

Q. Could he have in combination said I don't know or remained silent 24 times?

A. That's pure speculation.

Q. It was two hours, though?

A. That's correct.

Defense counsel also cross-examined Reeves about defendant's reluctance to answer questions during the period between 2:40 a.m. and defendant's first confession at 4:00 a.m., emphasizing that defendant repeatedly had expressed his desire not to answer questions about the murders. Reeves's testimony during this exchange follows:

Q. My question to you is, how many times does a person have to tell you that he or she doesn't want to deal with a particular issue?

A. No specific number of times.

Q. The card would indicate that only one time declining would be sufficient?

A. I'm not aware of that.

Q. Well, it's your job to discuss these things and explain them to suspects, isn't it[?]

A. That's correct.

Q. This is not just a mockery, is it? This has a real purpose in our administration of law?

A. That's correct.

Q. What then is your working interpretation of how many times a person has to decline speaking about a subject?

A. In regards to a Miranda warning, if he indicates to me that he does not want to make a statement, that is sufficient.

Q. And he indicated to you twice that he didn't want to sign a permission to search?

A. Right.

Q. And yet, at 4:20 it was brought up a third time?

A. That's correct.

Q. Now, Mr. Johnson also indicated on a number of occasions that he didn't want to get persons in trouble; is that correct?

A. That's correct.

Q. He never at any time said to you, but please ask me more questions to get in the back door, to find out some other way I can agree to talk to you, did he?

A. I don't recall him saying any statement like that.

Q. *He just said, I don't want to talk about it?*

A. *That's appropriate. That's one of the ways that he mentioned it.*

Q. How many times would it take a person to say to you, I don't want to talk about it before questioning—or item number five becomes operative?

A. When they ask me or tell me that they don't want to make any additional statements.

Q. *He said, I don't want to talk about it?*

A. *That's correct.*

Q. *And he said that on a number of occasions between 2:00 and 2:40; isn't that correct?*

A. *That's appropriate.*

Q. And on a number of occasions between 2:40 and [4:00]?

A. Yes, sir.

Q. Do you know what Mr. Johnson's educational background is?

A. I don't recall.

Q. Would it surprise you to know that he's a high school dropout?

A. I wouldn't be surprised.

Q. So, when we spoke about that card, it's not your contention that someone has to enumerate their rights, as if he or she were a lawyer, is it?

A. That's correct. (Emphasis added.)

Defendant argues that the "essence of [his] entire interrogation was his repeated unwillingness to talk about what had occurred." He contends that his statements that he did not want to or could not talk about the crime were sufficiently clear to indicate that he had invoked his right to remain silent. He also argues that if his statements were equivocal, the police had a duty to ask questions that would clarify his position. Not having done so, defendant argues, the detectives failed scrupulously to honor his rights.

We note initially that the trial court did not rule on defendant's claim that he had invoked his right to silence. The argument was made at the pretrial hearing, but it was addressed neither in the court's finding of facts nor in the court's ultimate ruling on the motion to suppress the confession. In that ruling the trial court made no mention of defendant's statements that he either could not or would not talk about the murders.

In order to resolve defendant's self-incrimination claim, we must consider whether defendant sufficiently invoked his right

to remain silent and, if so, whether the police scrupulously honored that right. *See State v. Bey (Bey* I), 112 *N.J.* 45, 63, 548 *A.*2d 846 (1988). We base our decision on both federal-constitutional principles and our own state-law protection against self-incrimination.

Custodial interrogation of a suspect must cease if the suspect indicates in any manner, at any time during questioning that he wishes to remain silent * * *. At this point he has shown that he intends to exercise his Fifth–Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. [*Miranda v. Arizona,* 384 *U.S.* 436, 473–74, 86 *S.Ct.* 1602, 1627–28, 16 *L.Ed.*2d 694, 723 (1966).]

The suspect is not required to express a desire to terminate interrogation with the "utmost of legal precision." *Bey* I, *supra,* 112 *N.J.* at 65, 548 *A.*2d 846. "[A]n equivocal indication of a desire to remain silent, like an unequivocal indication, suffices to invoke *Miranda* 's requirement that the interrogation cease." *Christopher v. Florida,* 824 *F.*2d 836, 840, 841 (11th Cir.1987), *cert. denied,* 484 *U.S.* 1077, 108 *S.Ct.* 1057, 98 *L.Ed.*2d 1019 (1988). Thus, a suspect who has "nothing else to say," *id.* at 842, or who "[does] not want to talk about [the crime]," *State v. Bishop,* 49 *Or.App.* 1023, 1025, 621 *P.*2d 1196, 1198 (1980), has asserted the right to remain silent, thereby requiring the police immediately to stop questioning. Indeed, "[t]he overwhelming majority of courts have agreed that 'any declaration of a desire to terminate the contact or inquiry * * * should suffice.'" *Bey* I, *supra* 112 *N.J.* at 65, 548 *A.*2d 846 (quoting W. LaFave & J. Israel, *Criminal Procedure* § 6.9e at 310 (1985)); *accord Martin v. Wainwright,* 770 *F.*2d 918, 924 n. 6 (11th Cir.1985) (suspect need not use "talismanic" words to invoke rights), *cert. denied,* 479 *U.S.* 909, 107 *S.Ct.* 307, 93 *L.Ed.*2d 281. Silence itself has been interpreted as an invocation of the right to remain silent. *See Watson v. Texas,* 762 *S.W.*2d 591, 597–98 (Ct.Crim.App.1988) (where suspect remained silent during thirty-to-forty-five minute interrogation,

silence itself constituted invocation of right to remain silent and police "were put on notice that their questioning should cease.").

Once the right to remain silent has been invoked it must be "scrupulously honored." *Michigan v. Mosley, supra,* 423 *U.S.* at 102–03, 96 *S.Ct.* at 325–26, 46 *L.Ed.*2d at 320–21; *Miranda, supra,* 384 *U.S.* at 467, 86 *S.Ct.* at 1624, 16 *L.Ed.*2d at 719; *Bey* I, *supra,* 112 *N.J.* at 66, 548 *A.*2d 846; *State v. Hartley,* 103 *N.J.* 252, 260–61, 511 *A.*2d 80 (1986); *see State v. Kennedy,* 97 *N.J.* 278, 288, 478 *A.*2d 723 (1984). In *Mosley, supra,* 423 *U.S.* at 105–06, 96 *S.Ct.* at 327–28, 46 *L.Ed.*2d at 322, the Court indicated that custodial interrogation could properly be resumed after the invocation of the right to remain silent, where a fresh set of warnings were provided after the passage of a significant period of time and the questions were restricted to a crime that had not been the subject of the earlier interrogation. Interpreting *Mosley,* we held in *Hartley, supra,* 103 *N.J.* at 267, 511 *A.*2d 80, that the issuance of a new set of warnings would be "indispensable" before questioning could be resumed. Where the invocation of the right to remain silent is followed by no interruption in questioning, and where the interrogation continues as if nothing had happened, the right is not scrupulously honored. *Bey* I, *supra,* 112 *N.J.* at 68–70, 548 *A.*2d 846; *accord Christopher v. Florida, supra,* 824 *F.*2d at 840–41 (officer should have stopped interrogation immediately when defendant indicated he wished to remain silent); *United States v. Poole,* 794 *F.*2d 462, 466 (9th Cir.1986) (officer should have stopped interrogation immediately when defendant said he had " 'nothing to talk about' "); *Anderson v. Smith,* 751 *F.*2d 96, 101–02 (2d Cir.1984) (police did not scrupulously honor defendant's right where defendant sought to terminate questioning but interrogator "plowed ahead"); W. LaFave & J. Israel, *Criminal Procedure* § 6.9 at 313 ("[T]he 'scrupulously honored' test is not met where the police did not honor original assertion of right to remain silent * * *.").

■ If, however, "following an equivocal indication of the desire to remain silent," the police are reasonably unsure whether the suspect was asserting that right, they "may ask questions designed to clarify whether the suspect intended to invoke his right to remain silent." *Christopher, supra,* 824 *F.*2d at 842 (footnote omitted; citations omitted); *Bey* I, *supra,* 112 *N.J.* at 65 n. 10, 548 *A.*2d 846 (citing *State v. Wright, supra,* 97 *N.J.* at 120 & n. 4, 477 *A.*2d 1265); *Martin v. Wainwright, supra,* 770 *F.*2d at 923–24 (where suspect asked whether questioning could "wait until tomorrow," the only "proper course of action would have been to attempt to clarify whether [suspect] indeed intended to invoke his right to cut off questioning"); *United States v. Lopez–Diaz,* 630 *F.*2d 661, 665 (9th Cir.1980) (suspect's statement that he did not want to talk "about the drugs in the van" but would talk about other subjects required police, who subsequently sought to return to subject, first to clarify whether suspect's position on questions about the drugs had changed). This Court has described the standard for police conduct when faced with ambiguous assertions of *Miranda* rights:

[W]here a suspect makes a statement which arguably amounts to an assertion of his *Miranda* rights and the interrogating agent recognizes that the statement is susceptible of that construction, his questioning with regard to the crime he is investigating should immediately cease and he should then inquire of the suspect as to the correct interpretation of the statement. Only if the suspect makes clear that he is not invoking his *Miranda* rights should substantive questioning be resumed. [*State v. Wright, supra,* 97 *N.J.* 113 at 120 n. 4, 477 *A.*2d 1265 (1984) (citation omitted).]

Such questioning is not considered "interrogation" under *Miranda,* because it is not intended to "elicit an incriminating response from the suspect." *Christopher, supra,* 824 *F.*2d at 842 n. 16 (quoting *Rhode Island v. Innis,* 446 *U.S.* 291, 301, 100 *S.Ct.* 1682, 1690, 64 *L.Ed.*2d 297, 308 (1980) (footnotes omitted)). The rule permits only clarification, not questions that "operate to, delay, confuse, or burden the suspect in his assertion of his rights. Because such questions serve to keep the suspect talking, not to uphold his right to remain silent, they constitute unlawful 'interrogation,' not permissible clarification." *Id.* at

842 (footnote omitted). Thus, for example, where the suspect indicated that he wanted to make a statement but added that he first wanted to tell his story to an attorney, it was wrong for interrogators to argue with the suspect about "whether having counsel would be in the suspect's best interest * * *." *Thompson v. Wainwright*, 601 *F.*2d 768, 771 (5th Cir.1979); *see also Christopher, supra*, 824 *F.*2d at 841–43 (suspect's conditional statement that he did not want to talk if he was being accused was equivocal, and no further questioning should have taken place until suspect's position was clarified).

■ Detective Donovan testified that defendant repeatedly responded to questions by saying, "I can't talk about it." That statement could be construed as an expression of either emotional reluctance to admit guilt or the desire to cut off questioning. In the face of that ambiguity the officers were required to stop the interrogation completely, or to ask only questions narrowly directed to determining whether defendant was willing to continue.

Defendant's reluctance to answer questions was not confined to an isolated, ambiguous remark. He persisted, for well over an hour, in a pattern of prolonged silences and unresponsiveness, refusing to answer any and all questions about the Sharps' murders. Under those circumstances, it was not defendant's obligation to state his position more clearly; the police officers had the duty to determine specifically whether defendant's uncooperative responses constituted an assertion of the right to cut off questioning.

The officers failed to clarify defendant's meaning. They continued defendant's interrogation as if nothing had happened long after defendant had completely stopped answering their questions. The failure of the interrogating detectives to have scrupulously honored defendant's right to remain silent makes inescapable the conclusion that defendant's subsequent oral confession had been unconstitutionally compelled. *Bey* I, *su-*

*pra,* 112 *N.J.* at 71, 548 *A.*2d 846; *Hartley, supra,* 103 *N.J.* at 271, 511 *A.*2d 80.

█ We appreciate that it is the rare suspect who confesses immediately after police questioning begins, and police officers must be accorded reasonable latitude to conduct an interrogation in a manner that permits a reluctant suspect to overcome the natural disinclination to confess to wrongdoing. Such interrogation will often encounter silence, denial, and evasive responses. We hold only that when a suspect's silence and refusal to answer continues, as here, for a prolonged period and is characterized by statements conveying an unwillingness to respond to any questions, then interrogation must cease and the police must affirmatively ascertain whether defendant's refusal to answer constitutes an assertion of the right to discontinue the interrogation.

We offer this additional perspective. One of the by-products of death-penalty litigation is an unrelenting focus by defense counsel on each aspect of the prosecution's case. It is inevitable, for example, that a confession in a capital case will be subjected to particularly careful scrutiny to verify that the now familiar requirements of *Miranda* and its progeny have been satisfied. Law-enforcement officials, as well as defense counsel, understand and anticipate this process. Whether local law-enforcement agencies should institute enhanced training procedures or deploy specially-trained units in the investigation and preparation of capital cases is beyond our province. We can only observe that the interests at stake in such cases are profound and the rules of review will not be relaxed.

B.

█ Having found that defendant's initial confession was illegally obtained and is therefore inadmissible in the State's case-in-chief, we consider whether the illegality of the first confession has tainted the second, taped confession, the consent to search defendant's room, and subsequent statements to the

police officer who escorted defendant from the interview room to prison.

Confessions obtained in violation of a defendant's constitutional rights are excluded at trial. *Silverthorne Lumber Co. v. United States,* 251 *U.S.* 385, 40 *S.Ct.* 182, 64 *L.Ed.* 319 (1920). Subsequent statements, confessions, or other evidence may be admitted if properly obtained unless, under the "fruit of the poisonous tree" doctrine, they are derived directly from the tainted confession. *Wong Sun v. United States,* 371 *U.S.* 471, 83 *S.Ct.* 407, 9 *L.Ed.*2d 441 (1963). Where a statement is coerced, "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Oregon v. Elstad,* 470 *U.S.* 298, 310, 105 *S.Ct.* 1285, 1293, 84 *L.Ed.*2d 222, 232–33 (1985); *see Bey* I, *supra,* 112 *N.J.* at 71–74, 548 *A.*2d 846. Here, as in *Bey* I, virtually no time passed between the first and the second confessions, the place did not change, and the interrogators remained the same. *Id.* at 73, 548 *A.*2d 846. Defendant began his oral confession at approximately 4:00 a.m. At 4:20 a.m., he executed a consent to search his room. Shortly thereafter, at 4:40 a.m., he began his taped confession:

In effect the two confessions were the product of a single, continuing interrogation, and thus the second is "burdened with the same constitutional infirmities[ ]" as the first, irrespective of the intervening warnings and putative waiver. *State v. Hartley, supra,* 103 *N.J.* at 279–80 [511 *A.*2d 80] (citing *Westover v. United States,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966); *Leyra v. Denno,* 347 *U.S.* 556, 74 *S.Ct.* 716, 98 *L.Ed.* 948 (1954)). Put another way, where the second confession is so intertwined with the first, it inevitably must be seen as the product of the first and thus wholly tainted by the preceding constitutional violation. *State v. Hartley, supra,* 103 *N.J.* at 284 [511 *A.*2d 80] (second statement coming "on the heels" of compelled statement is "unavoidably tainted"); *accord State v. Hartwig, supra,* 123 *Wis.*2d [278] at 283–87, 366 *N.W.*2d [866] at 869–71 [1985] (where police failed scrupulously to honor defendant's right to cut off questioning, subsequent confession obtained after ninety-minute wait, fresh warnings, and written waiver was tainted by earlier violation); *State v. Uganiza, supra* [68 *Haw.* 28], 702 *P.*2d [1352] at 1355 (half-hour wait; same result); *see Jones v. State,* 461 *So.*2d 686, 699–701 (Miss.1984) (reversing capital murder conviction) (court would not reach question of subsequent waiver where police earlier had refused to honor suspect's

request to cut off questioning); *cf. Robinson v. Percy*, 738 *F*.2d 214, 221 (7th Cir.1984) (statement *not* tainted by earlier violation where police did discontinue questioning after defendant reaffirmed his desire to remain silent, and defendant initiated the following confession himself). *See generally Wong Sun v. United States*, 371 *U.S.* 471, 83 *S.Ct.* 407, 9 *L.Ed.*2d 441 (1963); *Brown v. Illinois*, 422 *U.S.* 590, 95 *S.Ct.* 2254, 45 *L.Ed.*2d 416 (1975). [*Id.* at 73–74, 548 *A.*2d 846.]

Because the taped confession was tainted by the constitutional violation that led to the original oral confession, the taped confession was inadmissible, and like the oral confession, should have been excluded.

■ The statements made by defendant after his interrogation had ended present a closer question. Detective Watson of the Gloucester County Prosecutor's Office transported defendant to the Gloucester County Prison. Watson testified that he had at one time been a social acquaintance of defendant. Watson escorted defendant from the interview room to a car and drove him to the prison. During that time the two men renewed their acquaintance and engaged in conversation touching on defendant's involvement in the murders. Although defendant did not explicitly repeat his admission of guilt, he made several incriminating statements. For example, when the detective remarked that defendant had "really gotten [himself] jammed up this time," defendant agreed, commenting that he could "get the chair" for what he had done. Defendant also wondered whether he had done the right thing by confessing. He asked what effect his arrest might have on his brother's status as a local police officer, and expressed concern about his mother and how she would react to what had happened. After he left defendant at the prison, Detective Watson made notes and later wrote a report concerning his conversation with defendant.

In order to determine whether it was error to admit Watson's testimony concerning defendant's statements during the drive to the prison, we apply the criteria set out in *Oregon, supra,* 470 *U.S.* at 310, 105 *S.Ct.* at 1293, 84 *L.Ed.*2d at 232–33. Although Watson was not the person who interrogated defen-

dant, we observe that defendant's conversation with Watson began immediately after his interrogation had ended. His interrogators left the interview room and Detective Watson entered. Moreover, the most incriminating of defendant's statements, that he could "get the chair" for what he had done, was made while he was still in the interview room. Under such circumstances, the connection between the coerced confession and the allegedly voluntary statements is too strong to ignore. Even if defendant initiated the conversation with Watson, he could not possibly have appreciated the evidential value of his new admissions, independent of the detailed, explicit confession he had just completed. Thus, the conclusion is inescapable that such statements, made to a law-enforcement agent in the immediate aftermath of an unconstitutionally-coerced confession, are tainted by the constitutional violation that makes the first confession inadmissible at trial. We therefore hold that evidence of Detective Watson's conversation with defendant should have been excluded.

■ Defendant's consent to search his room is also "fruit of the poisonous tree." Before confessing, defendant rejected two requests for consent to search his room. At approximately 2:40 a.m., Detective Reeves asked defendant to sign a consent form. Defendant declined, indicating he had no authority to consent to a search of his parents' home. Reeves narrowed his request, emphasizing that the police wanted to search only defendant's room, but defendant still refused to consent. During his confession, however, defendant was asked what he had done with the murder weapon and he stated that he had hidden it under his mattress. Thereafter, the investigators renewed their request for permission to search defendant's room, and this time defendant agreed. As those facts demonstrate, defendant's consent to search was a direct outgrowth of his confession. Because the confession was illegally obtained, defendant's consent is infected by the illegality that renders his oral confession inadmissible. Therefore, defendant's purported consent was invalid.

■ The State argues, however, that even if the consent was ineffective, the fruits of the search should be admitted under the doctrine of inevitable discovery. *See State v. Sugar (Sugar II)*, 100 *N.J.* 214, 495 *A.*2d 90 (1985).

The record reveals that during defendant's interrogation by Detectives Reeves and Donovan, Detective Watson was preparing an affidavit to obtain a search warrant for defendant's room. Detective Watson had typed one-and-a-half pages of the affidavit by the time that defendant gave his oral confession. He suspended his typing efforts only after defendant had consented to the search.

The inevitable-discovery exception to the exclusionary rule was first defined in *Nix v. Williams*, 467 *U.S.* 431, 444, 104 *S.Ct.* 2501, 2509, 81 *L.Ed.*2d 377, 387 (1984), in which the Court reasoned "that exclusion of evidence that would inevitably have been discovered would * * * put the government in a worse position [than it would have been in, absent police error or misconduct] because the police would have obtained that evidence if no misconduct had taken place." The Court found that the "deterrence rationale" underlying the exclusionary rule would not be served if the prosecution could prove that "the information ultimately or inevitably would have been discovered by lawful means * * *." *Id.* at 444, 104 *S.Ct.* at 2509, 81 *L.Ed.*2d at 387–88.

This Court adopted a "restrictive formulation of the inevitable discovery exception" in *Sugar II, supra*, 100 *N.J.* at 238, 495 *A.*2d 90. We require that the State show by clear and convincing evidence that

(1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means. [*Ibid.*]

We applied that standard in *Sugar*, a murder case, to uphold the admissibility of evidence that the victim's body had been

found buried in the defendant's backyard, even though the evidence had been discovered during an illegal search. *State v. Sugar*, 108 *N.J.* 151, 527 *A.*2d 1377 (1987) (*Sugar* III).

On the present record, it is clear that the State could satisfy its burden under *Sugar* II. There is clear and convincing evidence that (1) Detective Watson was engaged in the preparation of the affidavit in support of an application for a search warrant in the hours following defendant's arrest; (2) the application would have been granted because probable cause existed independent of defendant's confession, based on information supplied to the investigators by other sources; and (3) the investigators inevitably would have exercised the search warrant and found the evidence they did find. Therefore, we conclude that the evidence seized from defendant's room was properly admissible under the doctrine of inevitable discovery and may be admitted on retrial.

To summarize, investigators interrogating defendant failed to clarify defendant's ambiguous statement that he was either unwilling or unable to discuss the Sharp murders. That failure rendered the continued interrogation of defendant coercive as a matter of law, and violated federal-constitutional and state-common-law rights. Therefore, defendant's oral confession was erroneously introduced at trial. Under the "fruit of the poisonous tree" doctrine, defendant's subsequent taped confession, as well as incriminating statements made immediately thereafter to Detective Watson, were also inadmissible, notwithstanding defendant's purported waiver of his rights and his initiation of the conversation with Watson. Defendant's consent to search his room was likewise tainted by the illegally coerced confession, but the fruits of that search are admissible on retrial under the inevitable-discovery doctrine.

The State argues that even if it was error to admit defendant's confessions, his statements, and the evidence discovered during the search of his room, those errors were harmless in

light of the overwhelming independent evidence of the defendant's guilt.

[I]n assessing the impact of error in either the guilt or penalty phase of a capital case, we shall continue to determine reversibility on the basis of a qualitative determination that considers, in the context of the entire case, whether the error was clearly capable of affecting either the verdict or the sentence. * * * We are satisfied that its application in capital cases is sufficiently flexible to accommodate our heightened concerns and responsibilities in reviewing death-penalty prosecutions. [*Bey* I, *supra*, 112 *N.J.* at 94–95, 548 *A.*2d 846.]

The evidence of defendant's guilt, independent of the illegal confession and the other evidence thereby rendered inadmissible, was substantial. Defendant's acquaintances Smith and Cattafi not only testified to defendant's incriminating admissions but also described how they had encountered defendant, smeared with blood on the afternoon of the murder, riding the bicycle that Tom Herrara had observed at the crime scene. Cattafi also described a ring with a bright blue stone that defendant had admitted stealing. Although the ring was never recovered, Alice Sharp's close friend, Sarah Morgan, testified that Mrs. Sharp had purchased such a ring a year before the murder. David Mecke, a carpenter who had employed defendant for a short time, testified that defendant had accompanied him to the Sharps' home when Mecke had occasion to return there to do follow-up work on an installation. The Chief Identification Officer of the Gloucester County Prosecutor's Office testified that a footprint found at the scene matched defendant's sneaker. A forensic expert testified that blood found on defendant's sneaker lace appeared to match that of the victim, Bruce Sharp. We acknowledge that that evidence of defendant's guilt is persuasive.

Notwithstanding the substantial evidence of guilt, we must conclude that the improper admission of defendant's confession "impact[ed] substantially and directly" on the fundamental procedural right to remain silent, and is "not amenable to harmless error rehabilitation." *State v. Czachor*, 82 *N.J.* 392, 404, 413 *A.*2d 593 (1984). Defendant's confession was so pow-

erful and so damaging to his defense that it is impossible to speculate about the effect on the jury of the remaining evidence had the confession been properly excluded. We therefore conclude that the error of admitting defendant's illegally-coerced confession into evidence was " 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.' " *Id.* at 402, 413 *A.*2d 593 (quoting *State v. Macon*, 57 *N.J.* 325, 336, 273 *A.*2d 1 (1971)). Defendant's admission of guilt in the penalty phase, occurring after the confession had been admitted into evidence, obviously cannot rehabilitate the verdict. We conclude that the errors in admitting defendant's confessions and other inculpatory statements "possess the clear capacity for producing an unjust result" not only in the murder prosecution, but in the robbery, theft, and weapons prosecutions as well. We therefore reverse defendant's convictions on all charges.

## III.

Because the violation of defendant's fifth-amendment and state-law rights requires reversal of the convictions, we address defendant's remaining arguments only to the extent that they present issues that will arise on retrial.

### A. *Venue*

Defendant argues that the failure of counsel to have moved for a change of venue in this case constituted ineffective assistance of counsel. On remand the trial court should consider whether "a change of venue is necessary to overcome a realistic likelihood of prejudice from pretrial publicity." *State v. Williams*, 93 *N.J.* 39, 67–68 n. 13, 459 *A.*2d 641 (1983); *see State v. Koedatich*, 112 *N.J.* 225, 282–83, 548 *A.*2d 939 (1988); *State v. Biegenwald, supra*, 106 *N.J.* at 30–37, 524 *A.*2d 130.

### B. *Voir Dire*

Defendant challenges as "woefully inadequate" the *voir dire* conducted by the trial court. We need not reach that

issue. We think it appropriate, however, to acknowledge defendant's contention that the trial court, during *voir dire*, "creat[ed] * * * a standard to be employed at the penalty phase which was higher than 'beyond a reasonable doubt,' " leading to the exclusion of jurors who might have been favorable for defendant.

The circumstances of the alleged error arose when two potential jurors indicated reservations about the death penalty. The trial court questioned those jurors to ascertain whether they would be able, notwithstanding their reservations, to follow the court's instructions and fulfill their oaths as jurors. *See State v. Ramseur, supra*, 106 *N.J.* at 255–57, 524 *A*.2d 188. The questioning proceeded, and the court eventually asked those venirepersons whether they would require the State to prove its case in the penalty phase by a standard even more difficult to satisfy than the "beyond a reasonable doubt" standard. An affirmative answer led to their disqualification as jurors. Our review of the record convinces us that the trial court's explanation of the "beyond a reasonable doubt" standard was inadequate to insure that the responses of the venirepersons reflected a state of mind incompatible with service on a death-penalty jury. To avoid the recurrence of that potential error or others on remand, we direct the trial court to conduct *voir dire* in accordance with the principles enunciated in *State v. Williams*, 113 *N.J.* 393, 408–45, 550 *A*.2d 1172 (1988).

C. *Footprint Identification*

At trial Henry Broughter, a fingerprint-identification expert, testified that a footprint found at the crime scene had been made by defendant's sneaker. Defendant argues for the first time on appeal that it was plain error to admit such evidence without first qualifying an expert specifically trained in footprint identification. The State argues that it was not error to admit such comparison testimony because fingerprint-identification expertise is "a sufficient basis" for making footprint comparisons. The State argues further that it "did not

need expert testimony in this area, since lay witnesses are perfectly capable of comparing the sole of a shoe with a shoeprint."

The admissibility of expert-opinion evidence rests within the discretion of the trial court. A lay witness may give an opinion on matters of common knowledge and observation. *State v. Labrutto*, 114 *N.J.* 187, 197, 553 *A*.2d 335 (1989) (investigating officer was properly permitted to testify regarding point of impact of two vehicles in automobile-accident case based on his personal observations, even though he was not qualified as accident-reconstruction expert); *see* Biunno, *Current N.J. Rules of Evidence*, comment 2 to *Evid.R.* 56 (1990).

Although we have never directly addressed the issue, two of our recent cases involved footprint-identification testimony by law-enforcement agents who were not qualified as footprint-identification experts. See *State v. Gerald*, 113 *N.J.* 40, 53–54, 61, 549 *A*.2d 792 (1988) (medical examiner and state police forensic chemist testify to sneaker pattern similarities); *State v. Bruzzese*, 94 *N.J.* 210, 215, 239, 463 *A*.2d 320 (1983) (similarity between footprint at crime scene and shoe in the defendant's room discovered by police detective). Other jurisdictions considering the issue have generally held that footprint identification does not require qualification of an expert. *See generally Annotation, Footprints as Evidence*, 35 *A.L.R.*2d 856, 881, § 13 (1954) (Later Case Service (1989)) ("The comparison of footprints [is] not a matter solely restricted to expert testimony"). The rationale underlying such decisions is that "shoeprint patterns are often 'readily recognizable and well within the capabilities of a lay witness to observe. No detailed measurements, no subtle analysis or scientific determination is needed.'" *Hutt v. State*, 70 *Md.App.* 711, 523 *A*.2d 643, 645–46 (1987) (quoting *State v. Hairston*, 60 *Ohio App.*2d 220, 223, 396 *N.E.*2d 773, 775 (1977)). Defendant cites no authority that would lead us to a different conclusion. We therefore reject defendant's contention that the failure to qualify Detective

Broughter as a footprint expert rendered inadmissible his comparison of the crime-scene print to defendant's shoe.

Our review of the record, however, indicates that Broughter may have been qualified as a fingerprint expert for the primary purpose of bolstering the credibility of his footprint testimony. Broughter's footprint testimony followed his description of the unsuccessful search for defendant's fingerprints in the Sharps' home. He described his effort to collect the shoeprint from the Sharps' hardwood floor using fingerprint-gathering techniques and equipment. Thereafter, he testified that footprint-analysis techniques were generally the same as fingerprint-analysis techniques. Moreover, Broughter's ultimate conclusion that defendant's sneaker had made the bloody impression that was discovered in the Sharps' foyer was based on his expertise and experience in the area of identifying prints.

 Because we hold that footprint identification is an area in which lay-opinion testimony is acceptable, we believe it would be improper to bolster such testimony by reliance on Broughter's qualifications as a fingerprint expert. We emphasize that we express no disapproval of the methods used to collect the evidence or to display for the jury the similarities between the crime-scene print and the exemplar made with defendant's shoe. Our ruling is narrowly limited to the impropriety of resting Broughter's conclusions about the shoeprint on his expertise in fingerprint analysis, and the possibility that his qualification as an expert in fingerprint analysis served no other purpose than to bolster the credibility of his footprint testimony.

### D. *Prosecutorial Misconduct*

 Defendant also contends that the prosecutor made improper comments during his guilt-phase summation that unfairly prejudiced the jury and violated defendant's fifth-amendment and state-law privilege against self-incrimination, as well as his due-process right to a fair trial. Specifically, defendant claims that the prosecutor repeatedly alluded to defendant's failure to

have testified on his own behalf by commenting on the lack of direct evidence in support of defense counsel's theory of the case. Moreover, defendant contends that the prosecutor improperly observed that defendant's failure to have made "eye contact" with the jury was suggestive of his guilt. Defendant argues that it was error for the trial court to have permitted those inflammatory comments during summation. We remind the prosecution that summation "is limited to commenting upon the evidence and the reasonable inferences to be drawn therefrom." *State v. Bucanis*, 26 *N.J.* 45, 56, 138 *A.*2d 739 (1958). It was clearly improper for the prosecutor to have suggested in any way either that defendant's failure to have testified or his failure to have made eye contact with the jury indicates guilt. On remand the prosecutor should be guided by the principles concerning prosecutorial misconduct set forth in *State v. Ramseur, supra,* 106 *N.J.* at 319–24, 524 *A.*2d 188; *State v. Rose,* 112 *N.J.* 454, 508–24, 548 *A.*2d 1058 (1988); and *State v. Williams, supra,* 113 *N.J.* at 446–56, 550 *A.*2d 1172.

E. *Blood–Spatter Testimony*

▇▇▇ The State offered Lieutenant Reeves of the Gloucester County Prosecutor's Office as an expert in blood-spatter analysis. The State contended that Reeves's interpretation of bloodstains at the crime scene would enable him to draw conclusions regarding the position and the movement of the victims at the time of the attack, and that that reconstruction of the events inside the Sharps' home would be both relevant and material to proving defendant's guilt. In connection with Reeves's testimony, the State sought to introduce forty-six color photographs depicting various blood spatters at the crime scene. Among those photographs were several that showed the bodies of the victims covered with blood.

Defendant challenges the State's assertion that blood-spatter analysis is an accepted field of scientific analysis, and vigorously contests Reeves's expertise in that field. The defense also argues that the admission of Reeves's testimony and the accom-

panying photographs violates *Evidence Rules* 4 and 56(2), as well as defendant's right to due process and a fair trial. In essence, defendant contends that the expert testimony was merely a vehicle for admitting gruesome photographs into evidence in an attempt to inflame the jury and increase the likelihood of a death penalty.

We do not decide whether blood-spatter analysis is an area sufficiently scientific to justify expert testimony, nor whether Reeves's credentials would qualify him as an expert in that field. We do not reach those questions because we hold that the limited probative value of that evidence with regard to the facts it was offered to prove is substantially outweighed by the risk that its admission will create substantial danger of undue prejudice. *See Evid.R.* 4.

We long ago set forth the general principles governing admission into evidence of crime-scene photographs:

> Pictures of a murdered body are likely to cause some emotional stirring in any case, but that of itself does not render them incompetent. They become inadmissible only when their probative value is so significantly outweighed by their inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the basic issue of guilt or innocence. [*State v. Thompson,* 59 *N.J.* 396, 421, 283 *A.*2d 513 (1971).]

We have noted that in order to be admissible, photographs must be "logically relevant" to an issue in the case. *Bey* II, *supra,* 112 *N.J.* at 182, 548 *A.*2d 887. The prosecution may not, however, "use at will any and all pictures at a murder trial as long as they possess[ ] some relevancy." *State v. Bucanis, supra,* 26 *N.J.* at 53, 138 *A.*2d 739. "Whether evidence is admissible depends upon a composite of factors, and its relevance may on occasion be overbalanced by more weighty considerations militating for exclusion." *Ibid.* (citation omitted). The "admissibility of photographs of the victim of a crime rests in the discretion of the trial court, and the exercise of its discretion will not be reversed in the absence of a palpable abuse thereof." *State v. Thompson, supra,* 59 *N.J.* at 420, 283 *A.*2d 513 (citations omitted).

The State contends that Lieutenant Reeves's blood-spatter testimony "provided the jury with a virtual eyewitness view inside the Sharp home on the afternoon on [sic] April 29, 1984." Specifically, the State asserts that Reeves's testimony provided the jury with the information that Mr. Sharp had lain prostrate when shot; that Mrs. Sharp had been struck more than once with a ceramic vase and had suffered a minimum of seven injuries; and that Mrs. Sharp had struggled with her attacker. The State also suggests that Reeves's testimony contradicted the defense theory that others had participated in the murder, because Reeves's evaluation of the crime scene indicated that Alice Sharp's attacker acted alone.

Defendant argues that the testimony is not probative of any material fact in the case. The record demonstrates that the medical examiner had already established the cause of death and the extent of the assault. Reeves's testimony was merely cumulative on those issues. Information about the parts of the house where the attack had taken place and the directionality of the blows, although startling, proves neither the intent nor the identity of the attacker. Although the testimony is not irrelevant, it is largely corroborative of other, essentially unchallenged testimony indicating the manner of death. Thus, it was only minimally probative of defendant's guilt.

Although the blood-spatter testimony was of only limited probative value, its admission created a substantial danger of undue prejudice to defendant. Reeves's lengthy presentation exposed the jury to numerous crime-scene photographs depicting the victims' bodies, as well as forty-two slides depicting blood-spatter exemplars, which Reeves used to highlight his expertise in the area. Such testimony, extending over the course of an entire day at trial, could not help but focus the jury's attention on the gruesome details of the condition of the victims' bodies, rather than on defendant's guilt. We understand that some of the most inflammatory photographs were excluded from the jury's consideration, but we do not believe that on balance such exclusion reduced the potential for undue

prejudice to defendant. We disagree with the trial court's ruling that the blood-spatter testimony is admissible because it is part of the entire picture of the crime. On retrial, that testimony should not be admitted unless and to the extent that it is offered to prove material facts, and then only if its probative value outweighs the danger of prejudice.

We note that the blood-spatter testimony, of tenuous probative value in the guilt phase, would be of even less value in the penalty phase on retrial. The existence of blood alone does not prove that the murder was committed with a special intent to inflict "severe physical or psychological pain or suffering to the victim prior to the victim's death * * *." *State v. Ramseur, supra,* 106 *N.J.* at 211, 524 *A.*2d 188 (footnote omitted). We therefore conclude that if the retrial results in a penalty phase, the blood-spatter testimony should be excluded.

### F. *Other Photographs*

Defendant also challenges the admission of other crime-scene photographs during both the guilt and penalty phases of the trial. Because the conviction must be reversed on other grounds, we do not rule on that challenge, but alert the trial court on remand to the standards set forth in *State v. Thompson, supra,* 59 *N.J.* 396, 283 *A.*2d 513, and exemplified in our recent cases. See *State v. Moore,* 113 *N.J.* 239, 295–97, 550 *A.*2d 117 (1988); *State v. Rose, supra,* 112 *N.J.* at 533–36, 548 *A.*2d 1058; *Bey* II, *supra,* 112 *N.J.* at 181–83, 548 *A.*2d 887.

### G. *Diminished–Capacity Charge*

Defendant, as a heroin addict, argues that a claim of "diminished capacity" in accordance with *N.J.S.A.* 2C:4–2 constituted his "most viable defense" to the charges of knowing and purposeful murder. He contends that the failure of trial counsel to have requested the charge was ineffective assistance, and that the failure of the trial court to have given the charge *sua sponte* constituted reversible error. In the event

that the question arises on remand, the trial court should determine whether to submit the question of diminished capacity to the jury based on the principles set forth in our decision in *State v. Breakiron*, 108 *N.J.* 591, 532 *A.*2d 199 (1987); however, the trial court should be guided by the Chief Justice's memorandum of October 27, 1989, instructing trial courts, in accordance with the Third Circuit Court of Appeals decision in *Humanik v. Beyer*, 871 *F.*2d 432, *cert. denied*, —— *U.S.* ——, 110 *S.Ct.* 57, 107 *L.Ed.*2d 25 (1989), no longer to "require criminal defendants who raise the defense of mental disease or defect under *N.J.S.A.* 2C:4-2 to prove the existence of the alleged mental disease or defect by a preponderance of the evidence."

### H. *Other Issues*

1. Although the issue was not raised, on retrial the jury charge on capital murder should be consistent with our opinion in *State v. Gerald, supra*, 113 *N.J.* at 69–91, 549 *A.*2d 792. The trial court must also determine whether there is a rational basis in the evidence to support a separate charge on serious-bodily-injury murder with respect to either of the victims. See *State v. Crisantos (Arriagas)*, 102 *N.J.* 265, 278, 508 *A.*2d 167 (1986); *see also State v. Long*, 119 *N.J.* 439, 575 *A.*2d 435 (1990) (rational basis for serious-bodily-injury-murder charge); *State v. Pennington*, 119 *N.J.* 547, 575 *A.*2d 816 (1990) (same); *State v. Coyle*, 119 *N.J.* 194, 574 *A.*2d 951 (1990) (same); *cf. State v. Pitts*, 116 *N.J.* 580, 614–20, 562 *A.*2d 1320 (1989) (rational basis for serious-bodily-injury-murder-charge, but failure to give charge was harmless error).

2. Defense counsel's summation presented the jury with a new theory of the case. Counsel's review of the evidence suggested that defendant had not acted alone when he killed the Sharps. Although counsel conceded that defendant had shot Mr. Sharp, he indicated the likelihood that defendant's acquaintances Smith and Cattafi had killed Mrs. Sharp. Therefore, counsel argued, defendant had not killed Mrs. Sharp "by

his own conduct," *N.J.S.A.* 2C:11–3c, thus rendering him ineligible for the death penalty for that crime.

On appeal defendant argues that the trial court never mentioned the requirement that the jury determine that the murders were committed "by [defendant's] own conduct," and that such explanation of the standard as the court incidentally undertook was "fatally flawed." Because the case must be retried, we will not address that issue. If the jury on retrial is to be instructed on the proof necessary to establish "by your own conduct," the trial court shall be guided by this Court's opinions in *State v. Gerald, supra,* 113 *N.J.* at 92–97, 549 *A.*2d 792, and *State v. Moore, supra,* 113 *N.J.* at 297–303, 550 *A.*2d 117.

3. At trial the State sought to prove as an aggravating factor of both murders that "[i]n the commission of the murder, the defendant purposely or knowingly created a grave risk of death to another person in addition to the victim." *N.J.S.A.* 2C:11–3c(4)(b). Defendant challenged the applicability of that aggravating factor. The trial court rejected defendant's challenge. It is uncontested, however, that Bruce Sharp was killed before Alice Sharp. Because he was dead, the attack on Mrs. Sharp could not possibly have created a risk of harm to Mr. Sharp. We find that it was inappropriate to submit aggravating factor c(4)(b) to the jury.

4. Defendant contends that the trial court's charge on aggravating factor *N.J.S.A.* 2C:11–3c(4)(c) was "incomplete and inadequate." If the State seeks to prove that aggravating factor on remand, and the trial court determines that the evidence is adequate to submit that factor to the jury, the trial court should instruct the jury in accordance with the principles set forth in *State v. Ramseur, supra,* 106 *N.J.* at 211, 524 *A.*2d 188.

5. The State concedes that the trial court erroneously instructed the jury in the penalty phase that in order for a mitigating factor to be given consideration, all of the jurors had

to agree on its existence. It is a clearly-defined principle of our death-penalty jurisprudence that "[as] long as one juror believes in the existence of a mitigating factor, that juror should be permitted to engage in the weighing process." *Bey* II, *supra*, 112 *N.J.* at 160, 548 *A.*2d 887 (citing *Mills v. Maryland*, 486 *U.S.* 367, 373–76, 108 *S.Ct.* 1860, 1865–66, 100 *L.Ed.*2d 384, 393–95 (1988)). On remand, if the State seeks the death penalty, the jury must be charged in accordance with that principle.

## IV

We remand to the Law Division for a new trial on all charges. Because defendant was not sentenced to death for the murder of Bruce Sharp, the State may not seek the death penalty on retrial of that charge. *Bullington v. Missouri*, 451 *U.S.* 430, 445, 101 *S.Ct.* 1852, 1861, 68 *L.Ed.*2d 270, 283 (1981).

HANDLER, J., concurring in part and dissenting in part.

The Court holds that defendant's oral confession was illegally coerced, that his subsequent taped confession, other statements to police and consent to search are tainted fruits of that illegality, and that this evidence was material to defendant's prosecution, thereby necessitating reversal of the convictions. *Ante* at 268, 576 *A.*2d at 837. I concur in that judgment. Further, I base my concurrence on constitutional grounds that render invalid the capital-murder statute, *N.J.S.A.* 2C:11–3.

I dissent, however, from the Court's judgment that aggravating factor *N.J.S.A.* 2C:11–3c(4)(c) may be re-presented at a subsequent penalty phase with respect to the murder of Alice Sharp. *Ante* at 301, 576 *A.*2d at 854. Beyond my previously-expressed estimation that *N.J.S.A.* 2C:11–3c(4)(c) is constitutionally infirm, *see State v. Ramseur*, 106 *N.J.* 123, 394–404, 524 *A.*2d 188 (1987) (Handler, J., dissenting), I believe that the State proffered insufficient evidence on the c(4)(c) factor at the penalty hearing in this case and that double jeopardy and fundamental fairness principles therefore preclude the State from at-

tempting to re-establish the factor with previously undiscovered or undisclosed evidence. *State v. Biegenwald,* 110 *N.J.* 521, 542, 542 *A.*2d 442 (1988); *State v. Biegenwald,* 106 *N.J.* 13, 51, 524 *A.*2d 130 (1987).

In order to establish aggravated battery/torture, the State must prove beyond a reasonable doubt that defendant intended to cause, and did in fact cause, gratuitous suffering in addition to the death of the victim. *See State v. McDougald,* 120 *N.J.* 523, 584, 577 *A.*2d 419, 450 (1990) (Handler, J., dissenting). Here the State introduced evidence that the victims caught defendant in the act of burglarizing their home and that he then killed them to prevent detection and prosecution for that crime. Defendant's various statements to friends and police describe his efforts to kill Alice Sharp, first with a gun and then with a fireplace poker as she tried to escape. There was no evidence that defendant intended to cause Alice Sharp severe physical or mental suffering in addition to death, the precise supplementary intent that makes a killing more condemnable and therefore the subject of an aggravating factor. Accordingly, I would bar the State from advancing *N.J.S.A.* 2C:11–3c(4)(c) in the event defendant is re-convicted of the capital murder of Alice Sharp.

HANDLER, J., concurring in part and dissenting in part.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.