**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1354-18T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DERRICK D. GILLIAM,

    Defendant-Appellant.

_____

> Argued November 9, 2020 – Decided  January 11, 2021
>
> Before Judges Rothstadt and Mayer.
>
> On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 13-08-0837.
>
> Christopher Wilds, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Alison Perrone, First Assistant Deputy Public Defender, of counsel; Christopher Wilds, on the briefs).
>
> Dana R. Anton, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Christine A. Hoffman, Acting

Gloucester County Prosecutor, attorney; Dana R. Anton, on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Derrick D. Gilliam appeals from an October 31, 2018 judgment of conviction that was entered after he pled guilty to second-degree reckless vehicular homicide, N.J.S.A. 2C:11-5(a). The trial judge sentenced defendant to a five-year prison term, subject to a parole ineligibility period under the No Early Release Act, N.J.S.A. 2C:43-7.2, and consecutive to a federal prison sentence defendant was already serving.

On appeal, defendant challenges the trial judge's orders denying his motion to suppress the results of a warrantless blood draw allegedly taken without exigent circumstances and denying his motion to suppress his statement to police, which was allegedly obtained in contravention of Miranda,[1] after he had invoked his rights to remain silent and to counsel.

Having considered the facts from the record in light of the applicable principles of law, we vacate defendant's conviction, reverse the denial of his motion to suppress the blood draw results, and remand for a trial because there

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

were no exigent circumstances to support the warrantless blood draw. However, we affirm the denial of his motion to suppress his statement because defendant never invoked his right to remain silent or to have counsel present and his waiver of those rights was knowing and voluntary.

I.

On April 12, 2013, after drinking at a bar in Glassboro, defendant and his friend decided to drive to Philadelphia, Pennsylvania. At approximately midnight, according to defendant, while driving near the college in Glassboro at fifteen miles per hour, he struck a pedestrian outside of a house where a party was taking place.

Defendant immediately stopped, and everyone from the party—which the victim had evidently been attending—came outside to see what happened. At some point, defendant's friend left the scene before police arrived. Later, the victim died from the injuries he sustained after being hit by defendant's car.

Local police officers responded to the scene at approximately 12:30 a.m., which they described as being "very loud and chaotic" and located in a "high traffic area." The police "closed off" the road until their investigation ended at 1:37 a.m. At the scene, emergency medical services (EMS) and paramedics were assisting the victim, who was unconscious the entire time. During this

time, police described defendant as "agitated and argumentative." As part of the investigation, the police discovered an open bottle of alcohol in defendant's vehicle, detected an odor of alcohol emitting from defendant, and heard him tell a bystander had consumed one alcoholic drink prior to the accident.

Defendant, who was not injured, was taken to police headquarters within twenty minutes of the polices' arrival at the scene, where they arrived at roughly 1:00 a.m. At the time, police described defendant as rambling and "fluctuating" in mood. When an officer attempted to administer a field sobriety test, defendant started yelling and refused the test, causing the officer to abandon the attempt. The police did not attempt to administer an Alcotest. The officers placed defendant under arrest for obstruction based on his lack of cooperation and then took defendant to a hospital for a blood draw.

At the hospital, defendant continued to be uncooperative and balked at permitting the blood draw. He stated that he wanted to make a phone call to ask some questions, although he did not state who he wanted to call. The officers did not permit the phone call at that time. Defendant eventually signed a form, indicating his consent, and at 1:56 a.m. the blood draw was completed, without force.

After the blood draw, defendant was taken to police headquarters where he was processed and placed in an interview room where a video-taped interrogation was conducted. After initially balking, defendant eventually consented to a waiver of his <u>Miranda</u> rights and gave a statement to police describing the events that led to the incident, which defendant blamed in part on the victim.

A Gloucester County Grand Jury later returned an indictment charging defendant with first-degree vehicular homicide, N.J.S.A. 2C:11-5(b)(3), and fourth-degree obstruction, N.J.S.A. 2C:29-1A. Thereafter, defendant filed motions to suppress his statement to police that he alleged was taken in violation of his <u>Miranda</u> rights, and the results of the warrantless blood draw. After conducting a hearing on October 19, 2017, the trial judge denied the motion to suppress defendant's statement, and on November 30, 2017, the judge denied the motion to suppress the blood draw's results.

Defendant pled guilty on September 11, 2018, to the vehicular homicide charge, which was amended to a second-degree offense. The remaining count of the indictment was dismissed. Although defendant pled guilty, he reserved the right to appeal the denial of his suppression motions. The trial judge

sentenced defendant and entered the judgment of conviction. This appeal followed.

On appeal, defendant raises the following points of contention:

POINT I

OFFICERS VIOLATED [DEFENDANT'S] RIGHTS BY CONDUCTING A WARRANTLESS BLOOD DRAW BECAUSE A) OFFICERS IMPERMISSIBLY CREATED THEIR OWN EXIGENT CIRCUMSTANCES, B) OTHER THAN THE SELF-CREATED EXIGENCY, THE CIRCUMSTANCES DID NOT JUSTIFY A WARRANTLESS BLOOD DRAW, AND C) OFFICERS HAD SUFFICIENT TIME TO OBTAIN A WARRANT. (RAISED BELOW).

A. OFFICERS IMPERMISSIBLY CREATED THEIR OWN EXIGENT CIRCUMSTANCES.

B. OTHER THAN OFFICERS' SELF-CREATED EXIGENCY, CIRCUMSTANCES SURROUNDING [DEFENDANT'S] ACCIDENT DID NOT JUSTIFY A WARRANTLESS BLOOD DRAW.

1. "CHAOTIC" SCENE OF THE ACCIDENT.

2. FLEEING PASSENGER AND [DEFENDANT'S] UNCOOPERATIVE BEHAVIOR.

3. OFFICERS' BELIEF ABOUT OBTAINING A WARRANT.

6

C. THE OFFICERS HAD TIME TO SECURE A WARRANT.

POINT II

THE TRIAL COURT ERRED IN DENYING [DEFENDANT'S] MOTION TO SUPPRESS STATEMENTS OBTAINED IN VIOLATION OF HIS MIRANDA RIGHTS. (RAISED BELOW).

A. LAW ENFORCEMENT FAILED TO SCRUPULOUSLY HONOR [DEFENDANT'S] INVOCATION OF HIS RIGHT TO REMAIN SILENT.

B. LAW ENFORCEMENT FAILED TO SCRUPULOUSLY HONOR [DEFENDANT'S] INVOCATION OF HIS RIGHT TO COUNSEL DURING HIS CUSTODIAL INTERROGATION.

C. [DEFENDANT'S] EVENTUAL WAIVER OF HIS RIGHTS WAS NOT MADE KNOWINGLY AND VOLUNTARILY.

In a pro se supplemental brief, defendant also argues the following:

POINT I

[DEFENDANT'S] 4TH AMEND[MENT] RIGHT PROHIBITING UNREASONABLE SEARCHES AND SEIZURES WAS VIOLATED WHEN THE COURT BELOW FAILED TO PROPERLY APPLY LAW AND FACTS TO THE CASE AT HAND, AND USED THE LESSER SOME EVIDENCE STANDARD INSTEAD OF SUBSTANTIAL EVIDENCE STANDARD, THUS RESULTING IN THE DENIAL OF APPELLANTS MOTION TO SUPPRESS, AND VIOLATING THE U.S. CONST'S 4 & 14th AMEND[MENTS], N.J.

7

CONST'S ART I, PARA 5 & 7, THE N.J. FAIRNESS
AND RIGHTNESS DOCTRINE.  [RAISED BELOW].

## II.

### A.

We begin our review by addressing the denial of defendant's motion to suppress the blood draw results.  In our review, we give deference to the trial judge's findings of fact that "are supported by sufficient evidence in the record." State v. Zalcberg, 232 N.J. 335, 344 (2018) (quoting State v. Hubbard, 222 N.J. 249, 262 (2015)).  Where the facts are not sufficiently supported, or they are "clearly mistaken, . . . [and] the interests of justice require," we will "examine the record, make findings of fact, and apply the governing law." Ibid. (alteration in original) (quoting Hubbard, 222 N.J. at 262-63).  However, we review the trial judge's "interpretation of the law . . . de novo."  Ibid. (quoting State v. Hathaway, 222 N.J. 453, 467 (2015)).

### B.

With these guiding principles in mind, we turn to the record of the hearing held by the trial judge as to the suppression of defendant's blood draw results. At the hearing, Corporal Stephen E. Cavallaro and Detective Jack Manning testified on behalf of the State.  Cavallaro stated that he was dispatched to the scene, on April 12, 2013, at 12:30 a.m.  He described the location as a busy

intersection in a college town. Cavallaro stayed at the scene but only for approximately fifteen to twenty minutes because it was "chaotic," as "[t]here was a lot going on with the EMS personnel, emergency apparatus, [and] a lot of noise from the ambulances."

Cavallaro stated that defendant was "agitated at the scene" and because of all the chaos, he did not get close enough to smell alcohol on defendant's breath. However, he did hear defendant tell a bystander that before the incident, he only had one drink.

Shortly before 1:00 a.m., Cavallaro decided to go back to police headquarters. Before he left, Cavallaro arranged for one of his sergeants to drive defendant there in a separate car. Once there, Cavallaro smelled alcohol on defendant's breath. He described defendant's behavior as "up and down," "agitated," "excited," and "rambling." He also said defendant argued with other arrestees at the station that night.

According to Cavallaro, when he attempted to conduct a field sobriety test, defendant refused and was uncooperative. He also did not administer an "Alcotest," which was partly due to defendant's lack of cooperation and the severity of the accident.

Defendant's uncooperativeness led Cavallaro to arrest defendant for obstruction. Once they began processing defendant, Cavallaro and the other officers "started planning out how [they] were going to obtain a blood sample," which was needed due to "the nature of the injuries and [Cavallaro's] belief that [defendant] was intoxicated." It was Cavallaro's understanding that for serious incidents there was a need to draw blood and that the officers would first attempt to get consent from defendant, but if defendant refused, the officers could use "reasonable force necessary to obtain the blood" at a hospital.

While those discussions were going on, defendant sat handcuffed to a bench. At approximately 1:36 a.m., defendant was told that he would be taken to the hospital for a blood draw.

According to Cavallaro, a search warrant was not needed. Even if it was, he was not aware of any procedure for obtaining a telephonic warrant, about which he never received any training, and, in any event, the police did not "have the resources to write a search warrant" the night of the incident, as police headquarters was "very busy" and there were not many officers available at the time. He and the other officers were also concerned about the passenger who fled the scene. For those reasons, the police never applied for a search warrant.

Cavallaro testified that defendant had expressed that he did not want to get his blood drawn on several occasions. He also indicated that defendant was only provided with a "Certificate of Request to Withdraw Specimen" once at the hospital. After looking at the form, defendant stated that he wanted to make a phone call but did not specify who he wanted to call. Cavallaro could not recall whether defendant wanted to speak to an attorney or someone else but confirmed he would not allow defendant to make the call until after the blood draw.

According to Cavallaro, once defendant was informed that the officers could use force to get his blood drawn, and he could not make a phone call, defendant became more cooperative and signed the form, but he still told the nurse on several occasions to stop the blood draw before eventually telling her to come back and complete it at 1:56 a.m.

Defendant was brought back to police headquarters at 2:31 a.m. At 2:45 a.m., he was placed in a room to be interviewed. He was still not given the opportunity to make a telephone call as he had requested at the hospital.

Manning testified that he was a patrol officer at the time of the incident and specialized as a crash investigator. He too was dispatched to the scene at approximately 12:40 a.m. and stated that it was chaotic.

A-1354-18T2

In his ensuing investigation, Manning observed the placement of defendant's vehicle, the position of the victim, and the open bottle of alcohol in the vehicle as unusual. Besides asking defendant if he needed an ambulance, Manning did not speak to defendant at the scene. In their brief exchange, defendant was cooperative but Manning "note[d] an odor of alcohol on his breath."

Manning spent an hour at the scene investigating and was notified before returning to police headquarters that defendant refused to do a field sobriety test and that a blood draw was to be conducted. Upon returning to headquarters, Manning informed defendant a "blood draw was mandatory," and "that he didn't really have a right to refuse." According to Manning, there was a specific policy that required a blood draw for "serious crashes [and] crashes with serious injuries." Later, when defendant initially refused to allow his blood draw at the hospital, Manning contacted the prosecutor's office to find out "what level of force [the officers were] authorized to use."

Manning confirmed that he was familiar with procedures for telephonic warrants, which detectives were generally allowed to obtain. He acknowledged that the prosecutor's office and the criminal division in general were required to

have someone available at all hours "to assist in preparing and making search warrant applications," as stated in an Attorney General's directive.

After the witnesses completed their testimony, the parties presented their oral arguments to the trial judge. The focus of those arguments was whether exigent circumstances existed warranting the blood draw.

The trial judge entered an order denying the motion on November 30, 2017, which was later supplemented by the judge's written decision filed on January 2, 2018. At the outset, the judge gave a factual background and found both witnesses to be credible. Considering the totality of the circumstances, the judge held the officers were in "an emergency situation that justified the warrantless blood draw."

In reaching this decision, the judge relied on "the chaotic scene, the fact that there were several civilians present at the scene, the severity of the crash, the fact that the passenger had fled the scene[,] . . . the uncooperative and argumentative behavior of . . . [d]efendant[,] . . . the officers' testimony that they objectively believed it was an emergency situation," and the "potential dissipation of the alcohol." He found the matter to be distinguishable from "a routine DWI stop," where there would not be exigent circumstances excusing the lack of a warrant.

C.

Both the United States Constitution and the New Jersey Constitution guarantee freedom from unreasonable searches and seizures by the government. U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. Taking a "blood sample for the purpose of alcohol-content analysis constitutes a search" under the Fourth Amendment. Zalcberg, 232 N.J. at 345 (citing Schmerber v. California, 384 U.S. 757, 758 (1966)).

Generally, a warrantless search is invalid unless it falls under the exigent circumstances exception. State v. McNeely, 569 U.S. 141, 148 (2013) (holding that dissipation of blood alcohol levels does not give rise to a per se exigency justifying a warrantless blood draw). In Zalcberg, the New Jersey Supreme Court explained how to determine if exigent circumstances exist, stating:

> There is no defined formula for determining whether there are exigent circumstances, and the term may take on different shape and form depending on the facts of a given case. . . . Absent a precise definition, applying the exigency doctrine demands a fact-sensitive, objective analysis based on the totality of the circumstances. . . . However, some factors to be considered in determining exigency include the urgency of the situation, the time it will take to secure a warrant, the seriousness of the crime under investigation, and the threat that evidence will be destroyed or lost or that the physical well-being of people will be endangered unless immediate action is taken. . . . The exigent-circumstances exception is

frequently cited in connection with warrantless blood draws.

[Zalcberg, 232 N.J. at 345 (internal quotation marks and citations omitted).]

See also State v. Adkins, 221 N.J. 300, 310 (2015) (describing the same considerations).

If a police officer "can reasonably obtain a warrant" for a blood test "without significantly undermining the efficacy of the search, [then] the Fourth Amendment mandates that they do so." McNeely, 569 U.S. at 152 (citing McDonald v. United States, 335 U.S. 451, 456 (1948)). See also Zalcberg, 232 N.J. at 347. If the "warrant process will not significantly increase the delay before the blood test is conducted because an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer . . . there would be no plausible justification for an exception to the warrant requirement." McNeely, 569 U.S. at 153-54.

In Zalcberg, the Court concluded that the circumstances in that case presented sufficient exigent circumstances to support a warrantless blood draw. Zalcberg, 232 N.J. at 351. There, police responded to a serious motor vehicle accident in 2011 that required assistance from "emergency medical and fire personnel." Id. at 338. Because the accident took place on a busy highway near

a "heavily trafficked" area, "several officers were deployed to block off access to the road and to direct traffic." Id. at 339.

When they arrived, emergency personnel determined that they could not access the vehicle being driven by the defendant, which was necessary to render aid to defendant and her passengers. Ibid. Equipment had to be brought in to remove a portion of the vehicle's roof so as to remove its occupants, who were then air lifted to a hospital. One of defendant's passengers later died from her injuries. Ibid.

As a result of observations made by emergency personnel at the scene, police suspected that the defendant had been under the influence of alcohol while driving. "Because defendant was incapacitated as a result of her injuries and therefore unable to undergo field sobriety tests, the officers decided that it would be prudent to obtain a sample of defendant's blood," which the responding officers understood was a "common practice" in serious accidents. Ibid. Although "[w]arrants were then available telephonically . . . none of the police officers present believed that a search warrant was required to obtain a blood sample and none of them had been trained in obtaining one." Ibid.

Instead of applying for a warrant, an officer went to the hospital where the defendant had been taken, waited there for "[a]bout an hour," and then had a

nurse perform the blood draw. Id. at 340. Later, a grand jury indicted the defendant and charged her with second-degree vehicular homicide and other charges. Ibid.

In reversing our opinion that affirmed the trial judge's granting of the defendant's motion to suppress the blood draw results, the Court concluded the "circumstances established . . . that there existed objective exigency justifying the officers' warrantless taking of defendant's blood sample." Id. at 351. The Court described the exigent circumstances it found as follows:

> Defendant's accident was a serious one, requiring the presence of several emergency-services units, the extrication of injured parties from a vehicle with the "Jaws of Life," and the need to transport victims via helicopter to a local hospital. The accident occurred on a typically busy state highway on the night of a nearby event that drew unusually high traffic. In addition to investigating the role played by alcohol in the crash, the officers present had to direct car flow, examine the wreckage, interview parties and witnesses, and document their actions, among other essential tasks.
>
> We conclude that any delay in seeking to obtain defendant's blood sample after the establishment of probable cause is attributed to the complexity of the situation and the reasonable allocation of limited police resources—not a lack of emergent circumstances, as argued by defendant. We further find that the hour for which the officer was forced to wait at the hospital before obtaining the blood sample does not undermine the State's claim of exigency.

[Ibid.]

The Court also "afford[ed] 'substantial weight' to the 'potential dissipation of' the alcohol in defendant's blood." Id. at 352 (quoting Adkins, 221 N.J. at 303).

The Court rejected the defendant's argument that there was no exigency because the police were able to secure a warrant telephonically. In doing so, the Court relied upon the fact "that the officers' lack of awareness of any formal procedure through which they could obtain a telephonic warrant, coupled with their pre-McNeely belief that they did not need such a warrant, suggests that there was no reasonable availability of a warrant." Id. at 352. See also Adkins, 221 N.J. at 313, 317 (giving McNeely pipeline retroactivity and acknowledging that before McNeely, New Jersey "case law played a leading role in dissuading police from believing that they needed to seek, or explaining why they did not seek, a warrant before obtaining an involuntary blood draw from a suspected drunk driver").

As the Zalcberg Court explained, "[p]rior to McNeely, [which was decided on April 17, 2013,] New Jersey, like many states, 'provided de facto, if not de jure, support for law enforcement to believe that alcohol dissipation in and of itself supported a finding of exigency for a warrantless search of bodily fluids in suspected driving-under-the-influence cases.'" Id. at 348 (quoting

<u>Adkins</u>, 221 N.J. at 303). After <u>McNeely</u>, the concern about dissipation was viewed as one factor that "courts must evaluate [when considering] the totality of the circumstances in assessing exigency," <u>ibid.</u> (quoting <u>Adkins</u>, 221 N.J. at 312, 317), but that factor "may be given substantial weight." <u>Id.</u> at 349 (emphasis omitted) (quoting <u>Adkins</u>, 221 N.J. at 303).

As the <u>Adkins</u> Court explained, under these circumstances, "when police may have believed that they did not have to evaluate whether a warrant could be obtained, based on prior guidance from our Court that did not dwell on such an obligation, we direct reviewing courts to <u>focus on the objective exigency of the circumstances that the officer faced in the situation</u>." <u>Adkins</u>, 221 N.J. at 317 (emphasis added). In <u>State v. Jones</u>, 441 N.J. Super. 317, 321 (App. Div. 2015), another case involving a pre-<u>McNeely</u> arrest of a defendant suspected of driving while intoxicated (DWI), we followed the <u>Adkins</u> Court's directions and held that the warrantless blood draw taken in that case was supported by the police officer's reasonable belief "that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'" <u>Id.</u> at 321 (quoting <u>Schmerber</u>, 384 U.S. at 770).

We described the facts in <u>Jones</u> as follows:

> The exigency of the circumstances did not depend
> solely upon the fact that alcohol dissipates in the blood.

19

Defendant drove her vehicle into a car stopped at a traffic light, propelling it into a third car in front of it at approximately 7:00 p.m. at a busy intersection. . . . Eleven police officers, at least two [EMS] vehicles and four EMS personnel, two fire trucks and an unknown number of firefighters responded to the accident scene. Defendant was in her vehicle unconscious and bleeding. . . . It took approximately one-half hour to extricate her from her heavily damaged car. . . . Both defendant and an occupant from one of the other vehicles, who was injured in the accident, were taken to the hospital for treatment. . . . Defendant did not regain consciousness until she was at the hospital. . . . The investigation at the accident scene took several hours. . . . The damage caused to a nearby building struck by defendant after hitting the vehicle raised a concern that the building might collapse. . . . The blood sample from defendant was drawn by a nurse approximately one hour and fifteen minutes after police responded to the accident scene and, upon testing, had a blood alcohol content of 0.345.

[Ibid. (citations omitted).]

The facts to which we applied Adkins' "objective exigency" test were substantially different than the facts in the case now before us. We initially observe that like the events in Zalcberg and Jones, defendant's arrest occurred before McNeely was decided, albeit just five days earlier. Under these circumstances, Zalcberg prevents us from faulting the police in this matter for believing that warrants were not required for a blood draw to the extent they had a legitimate concern about the dissipation of defendant's blood alcohol level due

to the passage of time created by exigent circumstances. As the United States Supreme Court explained in its pre-McNeely opinion in Schmerber, a warrantless search was permitted if a delay could have "threatened 'the destruction of evidence,'" as defendant's blood alcohol level would start to diminish as time was spent investigating the incident. 384 U.S. at 770-71 (stating that a warrantless blood draw was permissible because the officer "might reasonably have believed that he was confronted with an emergency").

Contrary to the trial judge's conclusion in this case, we discern no emergency that existed when the police made the decision to drive defendant to the hospital to secure the warrantless blood draw. The facts surrounding the scene of the accident that the trial judge relied upon did not bear upon the determination of whether exigent circumstances existed once defendant was removed from the scene within minutes of Cavallaro's arrival. After defendant's removal from the accident scene, exigent circumstances pertinent to the decision to obtain the blood draw had to be determined from the circumstances that existed at the police station. It is evident from the record that those circumstances did not give rise to a finding that an emergency existed or that police had a legitimate concern about dissipation such that police could not apply for a warrant.

If, as the officers testified, it was a policy in serious accident cases where alcohol use was suspected to have blood drawn from the driver without a warrant, there was no reason for Cavallaro to bring defendant to headquarters—rather than the hospital. Cavallaro testified that he was aware defendant had had at least one drink and that an open bottle of alcohol had been found in the car. If dissipation was a concern, there was no reason to first attempt to administer field sobriety tests at the police station or to wait for the arrival of Manning before taking defendant for a blood draw. Moreover, under these circumstances it would not have been necessary to return defendant to the police station before calling a prosecutor as the police eventually did, albeit not for help in getting a warrant but to determine the amount of force they could use to obtain the blood draw. Despite the policy about serious accidents being known to the officers and Cavallaro's belief a warrant was unnecessary, there was no rush to obtain the blood draw.

We are unpersuaded by the State's reliance upon defendant's uncooperative or argumentative behavior as creating exigent circumstances that gave rise to concern about dissipation, especially since they waited to take him to the hospital for some time after it became apparent that defendant was misbehaving.

Unlike in Zalcberg, police did not have to divert manpower from managing the accident scene to attend to defendant. The record indicates there was adequate personnel to manage the scene in the absence of Cavallaro, who was attending to defendant at headquarters. Before Manning's return to police headquarters, Cavallaro sat with defendant at the headquarters without any compunction to bring him to the hospital for a blood draw.

Also, unlike Zalcberg, defendant was not injured; he was only transported to the hospital for the blood draw. Moreover, there was no evidence explaining how defendant's passenger fleeing the scene impacted the need to quickly obtain defendant's blood in order to avoid dissipation. Here, unlike Zalcberg, officers leisurely removed defendant from the "chaotic" scene, brought him to police headquarters, attempted to secure his cooperation with field sobriety tests, charged him with obstruction, and only then—after he continued to be confrontational—took him to the hospital for the blood draw.

Here, to the extent the circumstances surrounding defendant's blood draw necessitated urgency, that necessity existed solely due to the police officers' self-created delay. This police-created exigency did not excuse the officers' obligation to obtain a warrant before drawing defendant's blood. See State v. Walker, 213 N.J. 281, 295 (2013) (stating that "in order to justify the officers'

23

warrantless home arrest here, the State must establish: (1) the existence of exigent circumstances, and (2) that those exigent circumstances were not police-created"); State v. Hutchins, 116 N.J. 457, 471 (1989) ("Where agents create the exigency themselves, warrantless activity is per se unreasonable." (quoting United States v. Webster, 750 F.2d 307, 327-28 (5th Cir. 1984))).

Under these circumstances, we are compelled to reverse the denial of defendant's motion to suppress the blood draw results, vacate his guilty plea, and remand for trial.

## III.

We turn our attention to the trial judge's denial of defendant's motion to suppress his statement to police. Here, we find no error and affirm.

## A.

In our review of a trial judge's decision on a motion to suppress a statement, we generally defer to the judge's factual findings when they are supported by credible evidence in the record. State v. Tillery, 238 N.J. 293, 314 (2019). Deference to those factual findings is appropriate "because the trial court has the 'opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy.'" State v. S.S., 229 N.J. 360, 374 (2017) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). Deference is

required even if the trial court's factual findings "are based solely on its review of a video recording." Id. at 386. However, we review de novo the trial court's legal conclusions that flow from established facts. Tillery, 238 N.J. at 314.

B.

At the hearing on defendant's motion to suppress his statements, Detective Michael Powell testified on behalf of the State and defendant's videotaped statement was played for the judge. The facts derived from the hearing are summarized as follows.

During the interrogation, Powell stated that defendant was arrested for obstruction, and that at the time there were no other charges against him. He stated that he did not "even know what [the other officers would be] charging [him] with." Defendant was given a Miranda form and was asked to read, acknowledge, and initial each right he was giving up.

After reading the form, defendant asked if he "need[ed] an attorney or something," to which Powell responded, "If you want an attorney, you're more than welcome to have one." In response, defendant stated that he had "never been arrested a day in [his] life. [He did not] know how this work[ed]. [He did not] want to jam [him]self up." Powell clarified that defendant had "every right to have an attorney. If [he] want[ed] one, [Powell would] stop right now."

Powell also stated that he just wanted to know what happened that night, and defendant stated that he understood. Powell reiterated to defendant that "[i]f [defendant did not] want to talk to [him] and [defendant] want[ed] an attorney, that's why [he was] reading [defendant his] rights." Defendant stated "[t]hat's fine" and that he could "get an attorney when [he left]" the interview and continued to read from the Miranda form.

After reading and acknowledging that he understood his rights, defendant stated that he was willing to speak to Powell and signed and initialed the form. Before questioning continued, Powell asked defendant whether he was sure he wished to continue speaking to Powell and told him that he did not have to answer any questions to which he did not want to respond.

In response to Powell's questions, defendant described the events of the evening leading to the accident, including that before the incident he had one alcoholic beverage and that the victim had run in front of his car. He also implied that his arrest was "race motivated," as he was a black man who hit a white man. He further stated that he had "never been through this process" and had previously asked to make a phone call.

Continuing with his description of what occurred, defendant stated that he believed the victim and his friends were playing a joke when the victim decided

to run in front of defendant's car.  During his statement, defendant noted that he was not refusing a field sobriety test, he first just wanted to know why the officers wanted to administer one.  Powell explained that the test was not administered at the scene because "a lot of people [were] around," which defendant stated he understood.

At the conclusion of the testimony and the playing of the videotape, the trial judge considered the parties' arguments as to whether defendant waived his Miranda rights or invoked them during his interrogation.  After considering the evidence and arguments, the trial judge denied defendant's motion.

In his oral decision, the judge stated that defendant did not have a right to an attorney at the time of the blood draw, therefore, any attempt to contact an attorney during the blood draw did not create a Fifth Amendment issue.  At the time of the interrogation, defendant was "clearly informed on his rights," which he voluntarily and knowingly waived.  The judge stated that there was "nothing to indicate . . . any force . . . was being used by Detective Powell" in attempt to have defendant waive his rights.

### C.

Defendant contends that his statements during the custodial interrogation should be suppressed, as the officers failed to honor defendant's invocation of

his right to remain silent by asking to make a phone call when he was at the hospital, and of his right to counsel during the interrogation when he stated he did not want to "jam [him]self up," even if his invocation was ambiguous. He additionally argues that Powell led him "to believe that he could avoid further criminal charges only by making a statement as to the accident," also warranting the suppression of his statement. We disagree.

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." S.S., 229 N.J. at 381 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). Miranda rights exist to combat the inherent and compelling pressures present in custodial interrogation, "which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467.

A suspect may waive Miranda rights, so long as the waiver is made knowingly, intelligently, and voluntarily. Miranda, 384 U.S. at 444; State v. A.M., 237 N.J. 384, 397 (2019) ("[T]he prosecution [must] 'prove beyond a reasonable doubt that the suspect's waiver [of rights] was knowing, intelligent and voluntary.'" (quoting State v. Presha, 163 N.J. 304, 313 (2000))).

28

A court evaluates whether the State has satisfied its burden by considering the "totality of the circumstances." A.M., 237 N.J. at 398. Under the totality-of-the-circumstances analysis, a court considers factors such as the defendant's "age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved." Ibid. (quoting State v. Miller, 76 N.J. 392, 402 (1978)).

Even if the officer reads a defendant his or her Miranda rights, the waiver of those rights is invalid if the defendant did not waive them knowingly, intelligently, and voluntarily. Fare v. Michael C., 442 U.S. 707, 724 (1979). See also Moran v. Burbine, 475 U.S. 412, 421 (1986) (requiring the prosecution to show a defendant had "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it").

Even after waiving Miranda rights, if during an interrogation a defendant makes "a request, 'however ambiguous,' to terminate questioning[, remain silent,] or to have counsel present[, the request] must be diligently honored." State v. Hartley, 103 N.J. 252, 263 (1986) (quoting State v. Kennedy, 97 N.J. 278, 288 (1984)). "[A]ny words or conduct that reasonably appear to be inconsistent with defendant's willingness to discuss his case with the police are

29

tantamount to an invocation" of the right to remain silent and a desire to cease questioning. S.S., 229 N.J. at 382, 384 (quoting State v. Bey, 112 N.J. 123, 136 1988) (holding a defendant invoked his right by stating: "No, that's all I got to say. That's it"); State v. Johnson, 120 N.J. 263, 281 (1990) ("[A] suspect who ha[d] 'nothing else to say,' . . . asserted [his] right to remain silent." (citations omitted) (quoting Christopher v. Florida, 824 F.2d 836, 842 (11th Cir. 1987))).

"If, however, 'following an equivocal indication of the desire to remain silent,' the police are reasonably unsure whether the [defendant] was asserting that right, they 'may ask questions designed to clarify whether the [defendant] intended to invoke his right to remain silent.'" Johnson, 120 N.J. at 283 (quoting Christopher, 824 F.2d at 841-42). The police are entitled to resume questioning if, in response to clarifying questions, the defendant indicates he is not invoking his right; in which case, any confession obtained thereafter is admissible. See ibid. ("[I]f the suspect makes clear that he is not invoking his Miranda rights . . . substantive questioning [may] be resumed." (quoting State v. Wright, 97 N.J. 113, 120 n.4 (1984))).

Applying these guiding principles, we observe at the outset that a blood draw "is non-testimonial in nature" and is "not covered by the privilege against self-incrimination," State v. Stever, 107 N.J. 543, 558 (1987), in the same

A-1354-18T2

manner that a routine request, attendant to an arrest or custody, that a suspect submit to a blood-alcohol test is not interrogation within the meaning of Miranda. Id. at 553. Here, at the time of defendant's blood draw, there was no interrogation, and therefore, the privileges against self-incrimination did not apply.

Once the interrogation began at the police station, statements by defendant created some confusion about whether he understood the rights he was relinquishing and whether he was invoking his right to counsel. However, Powell appropriately clarified whether defendant wanted to speak to an attorney when he stated, "If you want an attorney, you are more than welcome to have one"; "if you want one, we'll stop right now"; and "[i]f [defendant did not] want to talk and . . . want[ed] an attorney, that's why [Powell was] reading [defendant his] rights." In response to Powell's invitations for defendant to end the conversation so that he could secure counsel, defendant clearly stated that he would obtain an attorney after the interrogation was over. Further, the evidence established that, as found by the trial judge, defendant read, initialed, signed and understood the Miranda form, waiving his Miranda rights. Defendant unequivocally understood and waived his Miranda rights.

Additionally, at the time of the interrogation, Powell correctly informed defendant that he was arrested for obstruction and that he was unsure of any other charges that might later be brought against him. Powell, based on what he knew at the time, informed defendant of the seriousness of the victim's injuries. At the time of the interrogation, the victim had not died and the blood draw results were not available. Based on the totality of the circumstances, defendant was fully aware of the situation when he decided to waive his <u>Miranda</u> rights. Under these circumstances, we conclude the judge properly ruled that defendant's statements could be admitted into evidence.

Affirmed in part; reversed in part and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1354-18T2