# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1104-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

J.P.R.,[1]

     Defendant-Appellant.

_____

Argued May 14, 2024 – Decided July 1, 2024

Before Judges Firko and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 20-09-0589.

Lucas B. Slevin, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Lucas B. Slevin, of counsel and on the briefs).

Edward F. Ray, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; Edward F. Ray, on the briefs).

---

[1] We use initials to protect the victim's privacy. R. 1:38-3(c)(12).

PER CURIAM

Following the denial of his motion to suppress, defendant J.P.R. pled guilty to one count of second-degree sexual assault against a victim under the age of thirteen in violation of N.J.S.A. 2C:14-2(b).  He was sentenced in accordance with the plea agreement to a five-year custodial sentence subject to the No Early Release Act, N.J.S.A. 2C:43-7.2; parole supervision for life, N.J.S.A. 2C:43-6.4; Megan's Law registration, N.J.S.A. 2C:7-1 to -23; a sex-offender restraining order pursuant to Nicole's Law, N.J.S.A. 2C:14-12 and 2C:44-8; and an evaluation at the Adult Diagnostic and Treatment Center in Avenel.

Defendant appeals from the trial court's order denying his motion to suppress his statements made to police.  After considering all of his contentions in context of the record and applicable law, we reject defendant's argument that he did not knowingly, intelligently, and voluntarily waive his Miranda[2] rights because the detectives deliberately misled him into believing he was not a suspect when he was interrogated.  However, we conclude the detectives violated defendant's Miranda rights by failing to honor his several invocations

---

[2]  Miranda v. Arizona, 384 U.S. 436, 444 (1966).

of his right to silence and accordingly reverse the denial of his motion to suppress.

## I.

The events leading to defendant's arrest and conviction were described in detail at the suppression hearing at which Detective Dario Vargas testified on behalf of the State. At the time of the investigation, Detective Vargas was assigned to the Special Victims Unit in the Bergen County Prosecutor's Office. He has fourteen years of law enforcement experience. Detective Vargas was involved with the investigation of the sexual assault of defendant's cousin, A.C. On May 18, 2020, the Fairview police department received a phone call from A.C.'s parents reporting that A.C. had disclosed to them that defendant had sexually assaulted her six or seven years ago when A.C. and defendant resided together.

Detective Vargas interviewed A.C. and her mother on May 19 and 21, 2020. According to A.C., from July 11, 2013, through December 31, 2014, when she was between seven and eight years old, defendant sexually penetrated her vagina with his penis at her home on three occasions, twice in defendant's bedroom and once in the bathroom. At the time, defendant was nineteen years old. A.C. told Detective Vargas that defendant took her pants off on one

3

occasion in the bedroom, and she described his penis and his boxer shorts. A.C. recalled defendant removed both of their clothing and then brushed his penis against her vagina.

On May 22, 2020, Detective Vargas and Detective Jason Trignano[3] went to defendant's construction worksite at the end of the workday wearing shirts with "BCPO"[4] written on them and displaying badges. Defendant was seated in a truck. Defendant had limited proficiency in the English language. Detective Vargas informed defendant in Spanish that an investigation was being conducted "regarding a family topic, or a topic that [defendant] would probably be able to clarify" but did not mention they were investigating an allegation of sexual assault upon a minor. Detective Vargas requested defendant accompany them to their office for an interview. Defendant voluntarily agreed and was transferred by the detectives to the BCPO in Paramus.

During the twenty-minute ride, Detective Vargas only asked defendant about pedigree information, his place and date of birth, educational level and

---

[3] The name is misspelled in defendant's brief as "Trigano."

[4] Bergen County Prosecutor's Office.

about soccer, but did not discuss the investigation. Detective Vargas did not tell defendant that he was the suspect in the investigation.

Defendant's interview was conducted in Spanish, video recorded, and moved into evidence. The interview lasted for two hours and fifty-six minutes and was played for the trial court in its entirety. The parties and trial court utilized a transcript with an English translation during the hearing. Detective-Lieutenant Martic[5] was present, but did not ask any questions. Defendant remained in the interview room during the entire time and did not get up from his seat, remove his mask, or check his cell phone. Before reading defendant his <u>Miranda</u> rights, Detective Vargas told him he would be "transparent" and was "not here to hide anything."

At the outset of the interview, Detective Vargas provided defendant with a card listing his <u>Miranda</u> rights written in Spanish.[6] Detective Vargas read aloud from an identical <u>Miranda</u> card and informed defendant of his rights in Spanish. Defendant confirmed that he understood each right, and he initialed the form. He entered the ninth grade when he came to the United States due to

---

[5] Detective-Lieutenant Martic's first name is not contained in the record.

[6] Defendant stated he could read and write Spanish but could only read English, not write it.

his limited proficiency in English, and was attending night school to obtain his GED. During the day, defendant worked in construction.

Detective Vargas then asked defendant to read aloud the paragraph below his rights, which stated:

> I, [J.P.R.], have read the above statement of my rights and they have been read aloud to me. I understand what my rights are. I am now willing to answer questions without the presence of an attorney. No promises or threats have been made against me and no pressure or coercion has been used against me.

Detective Vargas asked defendant whether he understood what he had read, and defendant replied, "Yes" and wrote "Sí" and his initials on the form. Detective Vargas then stated that if defendant agreed to speak with him without an attorney, he could sign the form. Defendant stated: "Just one question. What are we going to talk about?" The following exchange then took place:

> [Detective Vargas]: That is why, [t]hat is what we are going to talk about, but for us to be able to talk—I am not going to speak to you if you do not answer whether you want to speak to me or not, understand? Without an attorney. You understand?
>
> [Defendant]: Okay.
>
> [Detective Vargas]: Now, what we talk about doesn't matter because at any moment, I have already read you your rights and you know what they are and they are always—your rights never get erased.

6

[Defendant]:  Okay.

[Detective Vargas]:  Your rights stay with you during the entire conversation.

[Defendant]:  Okay.

[Detective Vargas]:  At any moment you can exercise them, so are you willing to speak with me without an attorney?

[Defendant]:  Yes.

Detective Vargas told defendant to "relax," and he could waive his <u>Miranda</u> rights without "worry" because the police wanted to "obtain only certain" information about him, such as his name and address.  Defendant then signed the waiver portion of the <u>Miranda</u> form.

Initially, defendant denied the allegations.  Defendant explained that after emigrating to this country from Guatemala in 2012, he resided with his mother, sister, uncle, his uncle's wife, and his uncle's two children, M.C. and A.C. Defendant was seventeen years old at the time.  Detective Vargas questioned defendant about his cousins, including A.C., and he responded they didn't see each other much because of work and school schedules or being with a babysitter, but he saw them on weekends.

After defendant indicated he got along "nice" with A.C., Detective Vargas asked him if anything "inappropriate" happened between the two of them "while

7

playing a game" that A.C. "didn't like." Defendant responded, "No." Detective Vargas then told defendant—forty-five minutes into the interview—that he investigated sexual abuse cases and received a report regarding something that happened with A.C., and he was sure defendant knew it was coming. Defendant replied, "Yes, I knew."

Detective Vargas told defendant he spoke to A.C. and "things came out that she did not want to talk about" and "held in" for a long time. Defendant acknowledged he knew what Detective Vargas was referring to. Detective Vargas explained to defendant that A.C. was in a "very fragile state," "dying from sadness," "struggling mentally," and might commit suicide. Detective Vargas mentioned to defendant that he did not seem to be a bad person or predator "accosting women every day all of the time."

Defendant then denied knowing what the investigation was about and claimed he thought it had something to do with a letter he received advising he was under arrest. Detective Vargas asked defendant to tell him what happened between him and A.C. Defendant denied anything happened and stated,"[A.C.] never . . . went inside my room alone" because her mother would never permit it. However, defendant acknowledged that A.C. and M.C. would go into his room, which he shared with his mother, to play with him.

A-1104-22

Detective Vargas told defendant not to deny the allegations because A.C. provided details, including that she was sexually assaulted three times, the two of them were in his bed during the first assault, and she described defendant's bedroom, the comforter on his bed, and his clothes. Detective Vargas told defendant to "get [what happened] off [his] chest and be honest," because defendant was "hardworking," "religious," and had a "good head."

Detective Vargas told defendant he was giving him the "valuable . . . opportunity" to tell the truth because he felt defendant simply made an "error" in a "weak moment" and "didn't know where his mind was." Detective Vargas told defendant, "something happened between you and [A.C.] years ago, when you first got here from Guatemala, during those two or three years that you were in the apartment with [A.C.'s father]." Defendant denied that anything happened between him and A.C. when they lived together and responded, "I didn't do what she said I did." Defendant repeatedly shook his head "no" during many of Detective Vargas's accusations.

Detective Vargas discussed defendant's religious beliefs and tried to "buil[d] a rapport" with defendant because they were both Christians. Detective Vargas discussed the concepts of morality and forgiveness, and the commandment not to lie, explaining that confessing would lead to God's

9

forgiveness and make him "look better" and could result in prosecutorial leniency. Detective Vargas indicated to defendant that if he remained silent, he would be considered a "predator." Detective Vargas informed defendant that A.C.'s allegations, including that her vagina hurt after defendant assaulted her, made his behavior look like a "monstrosity," to which defendant replied, "I don't know what you are talking about."

By way of illustration, Detective Vargas compared defendant telling his side of the story to a disciplining parent by stating: "I am sure that if your mother let you give your version, she would not have hit you so hard, okay. Give you a slap, instead of a whipping, yes or no." Detective Vargas added, "[i]n the future, [God] forgives but [defendant had] to tell the truth."

Defendant repeatedly continued to deny A.C.'s allegations, but Detective Vargas went over A.C.'s account with him again. Detective Vargas told defendant he could tell the prosecutor he was direct, disclosed what happened, and that defendant ultimately wanted to help A.C. After being interrogated for over an hour, defendant yawned, and Detective Vargas asked if he was boring him. Defendant responded, "I'm just getting tired." Nonetheless, the interview continued.

Detective Vargas advised defendant that he "knew the truth," wanted defendant to tell the truth, and wanted defendant "to talk like a good Christian." But defendant answered, "I don't know how to tell you, I don't have anything to say." But the interview did not end. Detective Vargas told defendant that A.C. was approaching puberty, and they had to act quickly in order to avoid her becoming "damaged." Detective Vargas told defendant that he was tired from working that day, but A.C. "is tired from living with [what happened] in her life" and often wakes up due to nightmares.

Eventually, defendant stated he remembered A.C. was in bed next to him and that "she would always come—sometimes to bother me at the bed," and "almost nothing happened." Detective Vargas interjected with detailed accusations, and defendant denied all of them. Detective Vargas told defendant to "think in Jesus" and "get that off your chest." Defendant then stated when A.C. was in his room, he "attempted it" while he was listening to music and "tried to, like, how to experiment." Defendant stated he took off his "pants" and "[b]oxers" and A.C.'s "pants" and "panties." Detective Vargas asked defendant, "[a]t what point did you stop?" Defendant responded: "Uh, only, just, like, brushed up, that's it," and clarified that he brushed "[A.C.'s] vagina . . . with [his] penis," but "never put it in," he was "only on top," and "did reconsider."

A-1104-22

Defendant denied penetrating A.C.'s vagina but then stated he tried to put the tip of his penis inside her vagina, and stopped not because she complained of pain but because he "thought about the trouble that [he] could get into." Defendant denied using his hands on A.C., kissing her, or getting on top of her. He also stated he only assaulted A.C. twice, not three times as she claimed.

Defendant then admitted to inserting his penis into A.C. and acknowledged she complained that it hurt. Defendant did not tell Detective Vargas about the assaults at the beginning of the interview because he felt "ashamed," and he "would ask [A.C.] to forgive [him] but [did not] have the words to tell her why it happened. It was bad."

Defendant then told Detective Vargas that he wanted to go home. Detective Vargas replied that he had a few more questions and took defendant's cell phone and placed it near the door. The interrogation resumed ten minutes later. Defendant continued to deny that he assaulted A.C. in the bathroom. The interrogation ended at 6:40 p.m. Defendant was arrested after the interview concluded.

In a three-count indictment, defendant was charged with first-degree aggravated assault, N.J.S.A. 2C:14-2(a)(1) (count one); second-degree sexual

assault, N.J.S.A. 2C:14-2(b) (count two); and third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1) (count three).

Defendant filed a motion to suppress his statement to Detective Vargas. He argued the statement was not voluntary because Detective Vargas asked him to waive his Miranda rights under the false impression that he was not personally under investigation, and any post-waiver discussion would be limited to questions about his age and address. Defendant contended Detective Vargas did not stop the interrogation after he stated, "I don't have anything to say," but encouraged defendant to confess by employing coercive interrogation tactics.

The trial court conducted a three-day hearing, considered testimony from Detective Vargas and reviewed the video recording of defendant's interview, police report, Miranda form, and handwritten notes made by Detective Vargas and Detective-Lieutenant Martic. The trial court reserved decision and later issued a fourteen-page written decision. The trial court concluded defendant waived his Miranda rights and agreed to speak to Detective Vargas.

The trial court noted defendant "was not arrested for any crime and voluntarily went with the police to be questioned." Citing State v. Nyhammer, 197 N.J. 383, 405 (2009), the trial court reasoned that law enforcement is not obligated to inform a defendant of charges that have not been filed or that he or

13

she is a suspect in an investigation. The trial court determined there were no pending charges and defendant was not arrested at the time he was questioned. Therefore, the detectives were not required to tell defendant about the investigation against him.

Addressing whether the detectives were required to read defendant his Miranda rights during the car ride to the BCPO, based on the "totality of the circumstances," the trial court concluded defendant was not in custody at the time; he voluntarily agreed to go to the BCPO; and willingly offered background information to the detectives when asked. Further, the trial court found that defendant had the "opportunity to stop traveling" to the BCPO at any time but chose not to. The trial court explained there was no custodial interrogation to necessitate a reading of defendant's Miranda rights.

The trial court rejected defendant's argument that he invoked his right to conclude the interview when he stated, "I don't have anything to say." Additionally, the trial court found defendant did not make an ambiguous invocation after giving due consideration to the "context surrounding that statement." The trial court found defendant "was clearly not invoking his right to silence" and concluded "defendant's statement was a denial of [Detective Vargas's] accusations," based on the trial court's review of the video. The trial

14

court determined defendant's statement "was the product of a knowing and voluntary waiver of his Miranda rights," and his waiver of his privilege against self-incrimination was "knowing, intelligent, and voluntary in light of all the circumstances."

Regarding other relevant factors, the trial court noted defendant was twenty-four years old at the time of questioning; showed no signs of below average intelligence; was studying to obtain his GED; was questioned in Spanish, his native language; was not threatened at any time; and "was given full warning of his constitutional rights and explanations for the rights he did not understand." Although the trial court stated defendant was "tired" at one point of the interrogation, there was "no implication that his will was overborne" by Detective Vargas.

The trial court emphasized that Detective Vargas mentioned religion "but never threatened defendant with religion in a manner that would be considered coercive." Accordingly, the trial court denied defendant's suppression motion, concluding his Fifth Amendment rights were not violated. A memorializing order was entered. This appeal followed.

Defendant raises the following point with subparts on appeal:

> THE STATE FAILED TO ESTABLISH BEYOND A
> REASONABLE DOUBT THAT THE MIRANDA

WAIVER AND SUBSEQUENT STATEMENT WERE KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY MADE, AND THE POLICE FAILED TO SCRUPULOUSLY HONOR DEFENDANT'S REPEATED ATTEMPTS TO EXERCISE HIS RIGHT TO REMAIN SILENT, REQUIRING SUPPRESSION.

A. Defendant Did Not Knowingly, Intelligently, And Voluntarily Waive His Miranda Rights Because The Police Deliberately Misled Him Into Believing He Was Not A Suspect And Made Comments That Minimized The Significance And Contradicted The Meaning Of Miranda.

B. The Police Failed To Scrupulously Honor Defendant's Repeated Attempts To Exercise His Right To Remain Silent.

C. Defendant's Statement Itself Was Not Voluntarily Made Because Police Used Psychologically Coercive Tactics That Induced Him To Speak And Provided A Ready-Made Script For His Purported Confession.

II.

A.

Failure To Advise Defendant Of His Status As A Suspect In The Sexual Assault

We first consider defendant's argument that the trial court should have granted the motion to suppress his statements to Detective Vargas because Detective Vargas misled him into believing he was not a suspect and minimized

16

the gravity of the circumstances to gain his confession. Defendant claims the detectives violated <u>Miranda</u> from the onset by beginning his custodial investigation under the "false impression" that he was not personally under investigation and that any post-waiver discussion would be limited to "only basic questions" about his age and address. Defendant contends "any type of trickery" is prohibited during the <u>Miranda</u> waiver process. Similarly, defendant asserts law enforcement cannot disregard <u>Miranda</u> by advising an interrogee directly or by implication that his statements will not be used against him or her, and are thus prohibited from telling the interrogee his or her statement "could only help."

Relying primarily on <u>State v. Sims</u>, 250 N.J. 198 (2022), he argues Detective Vargas employed coercive tactics—both physical and psychological—which made defendant "vulnerable" to "police compulsion" and deceived him about the impact of the interrogation. Defendant asserts when he signed the <u>Miranda</u> waiver form, he did not know he was under investigation because Detective Vargas "intentionally did not disclose" that: (1) he was investigating an alleged incident of sexual assault; (2) he worked in the Special Victims Unit; (3) the complaining witness was A.C.; and (4) defendant was the sole suspect in the investigation.

A-1104-22

Defendant also relies upon State v. Diaz, 470 N.J. Super. 495, 522 (App. Div. 2022), and argues Detective Vargas's interview strategy to keep defendant from realizing that he faced possible prosecution for sexual assault by telling defendant the investigation concerned merely a "family topic" warrants suppression of his statement. We disagree.

We defer to the factual findings of the trial court on a suppression motion when they are supported by sufficient credible evidence in the record. Sims, 250 N.J. at 210; Nyhammer, 197 N.J. at 409 (citing State v. Elders, 192 N.J. 224, 243-44 (2007)). This is "because the findings of the trial judge . . . are substantially influenced by his [or her] opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy." State v. Reece, 222 N.J. 154, 166 (2015) (internal quotations omitted) (first alteration in original) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)). We review the legal conclusions drawn from the facts de novo. State v. Radel, 249 N.J. 469, 493 (2022); State v. Hubbard, 222 N.J. 249, 263 (2015).

The right against self-incrimination is guaranteed by the Fifth Amendment of the United States Constitution and New Jersey law. See U.S. Const. amend. V; N.J.S.A. 2A:84A-19; N.J.R.E. 503. "The administration of Miranda warnings ensures that a defendant's right against self-incrimination is protected

in the inherently coercive atmosphere of custodial interrogation."  State v. A.M.,

237 N.J. 384, 397 (2019).

To admit a statement obtained during a custodial interrogation, "the State

must 'prove beyond a reasonable doubt that the suspect's waiver was knowing,

intelligent, and voluntary in light of all the circumstances.'"  State v. Tillery, 238

N.J. 293, 316 (2019) (quoting State v. Presha, 163 N.J. 304, 313 (2000)); see

also Nyhammer, 197 N.J. at 405, n.11 (emphasizing the totality of the

circumstances analysis).  In order to determine whether a defendant's statements

were voluntary, the court considers "the totality of circumstances . . . ."  A.M.,

237 N.J. at 398.  These include a defendant's "age, education and intelligence,

advice as to constitutional rights, length of detention, whether the questioning

was repeated and prolonged in nature[,] and whether physical punishment or

mental exhaustion was involved."  Nyhammer, 197 N.J. at 402 (quoting Presha,

163 N.J. at 313).

"A court may consider on a case-by-case basis attendant circumstances

such as the length of the interrogation, the place and time of the interrogation,

the nature of the questions, the conduct of the police[,] and all other relevant

circumstances."  State v. Choinacki, 324 N.J. Super. 19, 44 (App. Div. 1999)

(citations omitted).  An investigator's statements must not be "manipulative or

19

coercive" because it could deprive a defendant of an "ability to make an unconstrained, autonomous decision to confess." State v. Di Frisco, 118 N.J. 253, 257 (1990) (quoting Miller v. Fenton, 796 F.2d 598, 605 (3d Cir. 1986)).

"Efforts by a law enforcement officer to persuade a suspect to talk 'are proper as long as the will of the suspect is not overborne.'" State v. Maltese, 222 N.J. 525, 544 (2015) (quoting State v. Miller, 76 N.J. 392, 403 (1978)). A false promise of leniency is not an inherently coercive lie. State v. L.H., 239 N.J. 22, 44 (2019) (noting a false promise of lenience may be coercive if the lie, "under the totality of the circumstances, ha[s] the capacity to overbear a [defendant]'s will").

In any event, we are satisfied based on the record before us defendant's argument fails on the merits. In Sims, our Court instructed "[t]he rule announced in A.G.D. is clear and circumscribed. If a complaint-warrant has been filed or an arrest warrant has been issued against a suspect whom law enforcement officers seek to interrogate, the officers must disclose that fact to the interrogee" before beginning their questioning. 250 N.J. at 213 (citing State v. A.G.D., 178 N.J. 56, 134 (2003)). "The officers need not speculate about additional charges that may later be brought or the potential amendment of pending charges." Id. at 214. Our Court directed that trial judges are to consider a defendant's claim

20

that police delayed lodging charges in order to avoid having to advise him or her of the charges faced "as part of the totality-of-the-circumstances test." Id. at 216.

We are satisfied after applying our Supreme Court's ruling in Sims to the record before us that the detectives had no obligation to advise defendant he was a suspect in the sexual assault of A.C. because defendant had not been charged with that or any crime related to those events when he was questioned by Detective Vargas. See id. at 214. Furthermore, unlike in Sims where law enforcement engaged in "bad-faith conduct" because they delayed "seeking a complaint-warrant or arrest warrant in order to avoid disclosing to an arrestee the charges that he faced," ibid., the record here simply does not support defendant's argument that Detective Vargas engaged in bad-faith conduct by intentionally misleading him into thinking he was not a suspect when the interrogation commenced.

Defendant's reliance on Diaz is also misplaced as it is clearly distinguishable from the matter before us. In that case, the defendant was suspected of first-degree strict liability for drug-induced death, N.J.S.A. 2C:35-9, due to his sale of heroin to a woman who subsequently overdosed and died. Diaz, 470 N.J. Super. at 502, 504. The police requested that the victim's

roommate contact the defendant and ask for "the same stuff" that he provided previously and arrested the defendant when he left his apartment. Id. at 505. After the arresting detective recited the Miranda rights to the defendant, the defendant asked what his arrest "was about," and the detective responded, "we [are] conducting an investigation involving narcotics." Id. at 506.

Upon arriving at the police station, another detective questioned the defendant, and he admitted to supplying the heroin. Id. at 507. After obtaining that admission, the detective alerted the defendant for the first time that the victim had died and that he was being questioned in connection with her death. Id. at 507-08. On appeal, we determined "the decision to withhold information about the overdose death . . . was part of a deliberate and designed investigative plan to induce [the] defendant to waive his right against self-incrimination." Id. at 524. We concluded that, viewed under the totality of the circumstances, the detective's misleading statement regarding the reason the defendant was taken into custody undermined the voluntary nature of his Miranda waiver. Id. at 519-20, 525.

Unlike in Diaz, Detective Vargas did not mislead defendant by using a related lesser crime to elicit information about a significantly more serious crime. Here, the detectives wore law enforcement clothing, had their badges

22

displayed, and approached defendant at his worksite. The detectives told defendant "that his name came up in an investigation involving a member of his family." This representation was repeated when the interrogation began. When defendant inquired what they were going to talk about, Detective Vargas responded that he would not speak to defendant unless he indicated whether he would talk without counsel present. Therefore, we find the detectives did not intentionally mislead defendant and undermine the voluntariness of his waiver because they told defendant the investigation involved him.

B.

Right To Remain Silent

We next address defendant's argument that the detectives failed to scrupulously honor his repeated attempts to exercise his right to remain silent. After signing the Miranda form, defendant contends he repeatedly and unequivocally denied any wrongdoing regarding A.C., and stated, "I don't have anything to say." Defendant's argument has merit.

"If [an] individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-74; see also State v. Chew, 150 N.J. 30, 61 (1997). Moreover, once a person has invoked the right to remain silent, this choice must

23

be "scrupulously honored" by investigators. State v. Hartley, 103 N.J. 252, 261 (1986) (citations omitted); see also Michigan v. Mosley, 423 U.S. 96, 103 (1975).

The "failure [to] scrupulously . . . honor a previously-invoked right to silence renders unconstitutionally compelled any resultant incriminating statement made in response to custodial interrogation." Hartley, 103 N.J. at 261 (noting "the requirement that the police 'scrupulously honor' the suspect's assertion of his right to remain silent is independent of the requirement that any waiver be knowing, intelligent, and voluntary"). See also State v. Burno-Taylor, 400 N.J. Super. 581, 589 (App. Div. 2008) (quoting Hartley, 103 N.J. at 261).

In referencing its prior decision in Hartley, our Court found "the admissibility of statements made by an accused after invoking the right to silence depends on the resolution of two separate inquiries: first, was the right scrupulously honored; [and] second, was the waiver knowing, intelligent, and voluntary?" State v. Fuller, 118 N.J. 75, 84 (1990). Further, our Court held,

> [i]f the police have not scrupulously honored the suspect's right to silence, the court should not reach the waiver issue. "Care must be taken . . . that there be no blurring of the separate lines of analysis that are followed in respect of the 'scrupulously honor' requirement on the one hand and the waiver issue on the other."

24

[State v. Adams, 127 N.J. 438, 445 (1992) (quoting Hartley, 103 N.J. at 261).]

Significantly, our Court also held "that if police are going to ask the accused to reconsider a previously-announced decision to remain silent, they must at the least readminister Miranda warnings as a reminder that the suspect can refuse." Fuller, 118 N.J. at 84. Further, our Court clarified that in Hartley, it "did not . . . state that fresh Miranda warnings alone are sufficient to satisfy the requirement that the right [to remain silent] be scrupulously honored, only that they are indispensable." Ibid. "If an accused does initiate a conversation after invoking his rights, that conversation may be admissible if the initiation constitutes a knowing, intelligent, and voluntary waiver of the accused's rights." Chew, 150 N.J. at 61.

After defendant claimed nothing happened between him and A.C., it was evident that he knew what the interrogation was about and then stated, "I didn't do what [A.C.] said I did." After sharing A.C.'s victim statement with defendant, Detective Vargas asked him to give his version, to which defendant replied, "I don't know what she's talking about. I don't know anything." Detective Vargas then told defendant that A.C. provided many details—including a description of his boxer shorts and penis—and asked defendant if he remembered A.C. ever being in his room and experimenting.

When defendant stated, "[s]o you want me to say—" Detective Vargas interjected and told him he did not want him to say anything and only wanted the truth and not to invent anything. Detective Vargas told defendant he wanted to give him an opportunity to "move forward like a good Christian." There was a pause before defendant shook his head "no" and then stated, "I don't know how to tell you, I don't have anything to say," and he again denied anything happened with A.C. in his bedroom or the bathroom.

Instead of ending the interrogation, Detective Vargas persisted in pressing defendant for answers to his questions. We conclude defendant's telling Detective Vargas "I don't have anything to say," was at the very least an ambiguous request to stop the questioning, and the detectives were duty bound under New Jersey law at that point to either accept defendant's response as a clear, unequivocal invocation of his right to silence or clarify what he meant. We conclude the detectives failed to honor defendant's right to silence. See State v. S.S., 229 N.J. 360, 383-84 (2017).

"[A]ny words or conduct that reasonably appear to be inconsistent with defendant's willingness to discuss his case with the police are tantamount to an invocation of the privilege against self-incrimination." Ibid. (quoting State v. Bey (Bey II), 112 N.J. 123, 136 (1988)). If a "suspect's statement is susceptible

26

to two different meanings, the interrogating officer must cease questioning and 'inquire of the suspect as to the correct interpretation.'" Id. at 382-83 (quoting State v. Johnson, 120 N.J. 263, 283 (1990)); accord Maltese, 222 N.J. at 545 (finding that when a "suspect's invocation [of the right to remain silent] is 'ambiguous,' officers are 'required to stop the interrogation completely, or . . . ask only questions narrowly directed to determining whether defendant [is] willing to continue.'" (second alteration in original) (quoting Johnson, 120 N.J. at 284)).

"In other words, if the police are uncertain whether a suspect has invoked his right to remain silent, two alternatives are presented: (1) terminate the interrogation or (2) ask only those questions necessary to clarify whether the defendant intended to invoke his right to silence." S.S., 229 N.J. at 383. "Unless the suspect makes clear that he is not invoking his right to remain silent, questioning may not resume." Ibid. The State has "the burden to prove beyond a reasonable doubt that a suspect's waiver of his privilege against self-incrimination . . . 'was knowing, intelligent, and voluntary in light of all the circumstances.'" Sims, 250 N.J. at 211 (quoting Presha, 163 N.J. at 313).

"Words used by a suspect are not to be viewed in a vacuum, but rather in 'the full context in which they were spoken.'" S.S., 229 N.J. at 382 (quoting

State v. Roman, 382 N.J. Super. 44, 64 (App. Div. 2005)). "To invoke the right to remain silent, a suspect does not have to follow a prescribed script or utter talismanic words." Id. at 383. Suspects can speak in "plain language using simple words." Ibid. As our Court recognized in State v. Bey (Bey I), 112 N.J. 45, 72 (1988), "where the police fail to halt the questioning even temporarily" when the defendant has tried to cut off questioning, "the ensuing danger of coercion and compulsion to confess is great, for the suspect perceives their conduct as an indication that the rights he has just been read mean nothing, and that he is going to be subjected to ongoing interrogation by the police until he talks."

The trial court did not analyze defendant's attempts to halt the interrogation under these standards, in accordance with Hartley, 103 N.J. at 260, and Bey I. The trial court expressed equivocation when it interpreted defendant's statement—"I don't know how to tell you. I don't have anything to say"—as being subject to different interpretations either defendant could not answer or does not want to answer Detective Vargas's questions. That was error.

Although the cases make clear "we traditionally look to the totality of the circumstances to assess whether the waiver of rights was the product of a free will or police coercion" in considering the voluntariness of a confession,

Nyhammer, 197 N.J. at 402, that test does not relieve a court of analyzing whether the defendant's right to silence has been honored in the first place, Hartley, 103 N.J. at 260 (instructing "the question of waiver is an inquiry separate and apart from . . . whether the defendant's right to remain silent has been properly respected in the first instance").

Because Miranda makes "clear that the requirement that the police 'scrupulously honor' the suspect's assertion of his right to remain silent is independent of the requirement that any waiver be knowing, intelligent, and voluntary," our Court has admonished that "[c]are must be taken . . . that there be no blurring of the separate lines of analysis that are followed in respect of the 'scrupulously honor' requirement on the one hand and the waiver issue on the other." Id. at 261. Here, the trial court ruled defendant waived his right to remain silent without analyzing whether the detectives scrupulously honored defendant's invocation of his right to remain silent.

Words like "I ain't sharing with you" are sufficient to invoke the right to silence. See S.S., 229 N.J. at 386 (holding a suspect who stated, "[n]o, that's all I got to say. That's it[,]" invoked the right to remain silent); Johnson, 120 N.J. at 281 (stating "a suspect who has 'nothing else to say' or who '[does] not want to talk about [the crime],' has asserted the right to remain silent" (citations

omitted) (alterations in original)); <u>Bey I</u>, 112 N.J. at 64 (finding a suspect who stated "he would have nothing to say" invoked the right to remain silent).

Our Court has made clear that "any words or conduct that reasonably appear to be inconsistent with [a] defendant's willingness to discuss his case with the police are tantamount to an invocation of the privilege against self-incrimination.'" <u>S.S.</u>, 229 N.J. at 382 (quoting <u>Bey II</u>, 112 N.J. at 136). Here, defendant's words conveyed his unwillingness to discuss the case. We hold that defendant invoked his right to remain silent when he said, "I don't have anything to say." The interview should have ended at that point; instead, the detectives ignored defendant's invocation of his right to remain silent and failed to either accept his statement as a clear, unequivocal invocation or at least clarify whether he was invoking his right to remain silent.

Therefore, we reverse the order denying suppression of defendant's statement and remand to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1104-22